NATIONAL FOOTBALL LEAGUE
PROPERTIES, INC. and New
York Football Giants, Inc., Plaintiffs,

v.

NEW JERSEY GIANTS, INC.,
Defendant.

Civ. A. No. 84–3560.

United States District Court,
D. New Jersey,
Civil Division.

May 8, 1986.

Townley & Updike, New York City by John Paul Reiner, Gary M. Gertzog; Meyner & Landis, Newark, N.J. by William J. Fiore, for plaintiffs.

Maloof, Lebowitz & Bubb, P.C., Florham Park, N.J. by Michael S. Bubb, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARRY, District Judge.

Plaintiff, the New York Football Giants, Inc., owns and operates the New York Giants, a major league professional football team which plays all of its home games in New Jersey yet eschews a New Jersey identification as resolutely as a vampire eschews the cross. Defendant, the New Jersey Giants, Inc., which is decidedly not a major league professional football team, was created and exists solely to illegally exploit the confusion engendered by the unwillingness of the team to correlate its name with the place it calls home. The other party to the case, plaintiff National Football League Properties, Inc. ("NFLP"), is the marketing arm of the twenty-eight present National Football League ("NFL") Member Clubs, and is licensed by those Clubs to use the NFL marks to promote the interests of the NFL and the Clubs while protecting those marks from infringement, dilution, misappropriation, and unfair competition.

Defendant, sensing an opportunity to exploit the anomoly of a team bearing the name of one state while playing in another, began to sell various items of sports-related apparel bearing the words "New Jersey GIANTS". Plaintiffs contend that defendant, as a result, has violated § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) and § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (service mark infringement and unfair competition); the New Jersey Trademark Act, N.J.S.A. 56:3–13.11; common law trademark infringement and unfair competition; tortious misappropriation of good will; and tortious interference with business relationships. They seek, among other relief, a permanent injunction, various damage awards, and attorneys' fees, costs, and expenses.

This opinion, of necessity, will analyze the host of violations pressed by plaintiffs in light of the facts as found and the law as applicable. I note at the outset, however, that the testimony of the three principals of this three man defendant corporation, who are not themselves named as defendants, goes very far in and of itself towards proving the violations with which defendant is charged and the propriety of certain of the relief sought. These men testified that one of the purposes for starting the business and incorporating the name, as they had previously incorporated the name "New Jersey Cosmos", was to sell the corporate name to the Giants' football team; that the other purpose was to sell the merchandise to fans of the Giants' football team who would associate and "no doubt" did associate that merchandise with the team; that even though in its best year the company sold but $2263.85 of merchandise and operated out of a law office, a post office box, and the back seat of the car of one of the principals, $30,000 worth of stock in the company has now been sold to three additional individuals; that two cease and desist letters were ignored with defendant, through its principals, continuing to do business and continuing to solicit business by means of radio spots which were intended to refer to the New York Giants' team and by means of advertisements in the "Giants News Weekly", a newsletter directed to Giants' fans and the

subject of which was the team; and that these actions continued until such time as a temporary restraining order was entered with notice to but no appearance by any representative of defendant.[1]

What came through from this testimony was an attempt to ride the New York Giants' coattails for one reason and one reason only—money. Defendant's attempt to foist upon the court a first amendment rationalization for its illegal actions and now to clothe those actions in justifications of "editorial content", "right to comment", and altruism are, in a word, incredible. Indeed, at no time from the inception of the New Jersey Giants, Inc., until the restraining order was entered was any hint given much less statement made in any ad placed in the print media or on radio or anywhere else that these individuals had any view about the team changing its name. Certainly, defendant's merchandise itself bearing the words "New Jersey GIANTS" over an outline of the State of New Jersey conveys no message whatsoever. And, I note, that separate and apart from the testimony of defendant's three principals, adduced on plaintiffs' case, defendant presented but one witness, an "expert" to whose opinion I accord no weight.

When all of the foregoing is considered together with the substantial additional evidence plaintiffs have presented, the conclusions I reach are inexorable. It is to that evidence and those conclusions that I now turn.

## FINDINGS OF FACT

Each of the 28 Member Clubs of the NFL owns and operates a professional football team engaged in providing entertainment services by playing competitive professional football games in various cities throughout the United States. The NFL Constitution establishes the New York Football Giants' home territory as the area within a seventy-five mile radius of the City of New York and, thus, the Giants' fans are concentrated in the New York metropolitan area which includes portions of New York, New Jersey, and Connecticut.

In the New York Football Giants' sixty-year history, home games have been played at several locations in the New York metropolitan area: the Polo Grounds, Manhattan, New York (1925–1955); Yankee Stadium, Bronx, New York (1956–September, 1973); Yale Bowl, New Haven, Connecticut (1973–1974)[2]; Shea Stadium, Queens, New York (1975); and Giants' Stadium, East Rutherford, New Jersey (1976–present). The New York Football Giants' decision to move to New Jersey was made in 1971 at which time an agreement was entered into with the New Jersey Sports and Exposition Authority under which the Giants agreed to play home games in East Rutherford, New Jersey, less than seven miles from midtown Manhattan, upon completion of the construction of Giants' Stadium. To maintain continuity of tradition, the Giants retained the name "New York Giants" when it began playing home games in New Jersey. This decision is embodied in the New York Football Giants' agreement with the New Jersey Sports and Exposition Authority.

To identify and distinguish their respective football teams and the entertainment

1. By letter dated August 9, 1984, NFLP's attorneys notified defendant that NFLP would file a lawsuit for injunctive and monetary relief if a non-judicial resolution of this matter was not reached by August 17, 1984. On August 30, 1984, NFLP's attorneys notified defendant by telephone that NFLP intended to file this action the next day. NFLP's attorneys and the Court notified defendant New Jersey Giants of the hearing on the temporary restraining order. Defendant did not appear and on August 31, 1984, the Court issued a temporary restraining order against defendant's use of the name "New Jersey Giants, Inc." and the solicitation and sale of merchandise bearing the marks "Giants" and

"New Jersey Giants". Shortly thereafter, the Court entered an order extending the temporary restraining order upon consent of defendant and directing a consolidation of the hearing on the motion for a preliminary injunction and a trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure.

2. The court notes that the Giants' foray into Connecticut was not necessarily by choice. During this period, the Giants were essentially homeless because Yankee Stadium was being renovated and suitable arrangements had not as yet been made at the other New York stadium.

services that they provide, the New York Football Giants and other NFL Member Clubs have adopted and have used in interstate commerce various names, logos, designs, color combinations, uniforms, and other identifying marks ("NFL marks"). The New York Football Giants' marks have been registered under federal law pursuant to the provisions of the United States Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.*, ("the Lanham Act") and under the statutory laws of the states of New Jersey and New York. Among these registered marks are included the marks "Giants" and "New York Giants" which are service marks for entertainment services in the form of professional football games and exhibitions. The marks "Giants" and "New York Giants" have been continuously used by the Club since 1925, and throughout its history the team has referred to itself and has been known by the media and fans as the "New York Giants" or the "Giants".

Because of the popularity of NFL football and the extensive media coverage it receives, the NFL marks, including those long standing marks of the Giants, are nationally recognized and have become well known in the metropolitan area in which each Member Club plays its home games. Moreover, the popularity of NFL football coupled with NFLP's promotional efforts which, as will become apparent, involved extensive advertising and culminated in an extraordinary volume of sales, have combined to create a public perception and consumer awareness that merchandise bearing the NFL marks is sponsored or authorized by the NFL and its Member Clubs. The NFL marks and, more particularly, "Giants" and "New York Giants," have achieved secondary meaning as identifiers of the NFL and its Member Clubs.

NFLP has established a licensing program in which it licenses selected companies to use the NFL marks on specific articles of merchandise and in approved promotional programs. NFLP has issued over one hundred national and local licenses for use of the NFL marks on a wide variety of merchandise including t-shirts, sweatshirts, caps, jackets, other wearing apparel, novelty items, sporting goods, toys and games and home furnishings, and apparel bearing the marks "Giants" and "New York Giants" has been manufactured and sold under NFLP license for many years. Moreover, the NFLP has established a quality control program in which it supervises and approves the conception, design, color combinations, production and distribution of all merchandise licensed to bear the marks of the Giants and other NFL Clubs.

Licensed articles of merchandise bearing NFL marks are sold by licensees throughout the United States in a wide range of distribution channels, such as mail order catalogs, major retail department store chains, and small retail sporting goods and athletic wear stores, including outlets in New York and New Jersey. NFLP's licensees have invested significant amounts of capital and have devoted substantial amounts of time to the production, marketing and promotion of merchandise bearing the NFL marks. For the four year fiscal period beginning April 1, 1980 and ending March 31, 1984, retail sales of NFLP licensed merchandise were in excess of four hundred million dollars ($400,000,000). NFLP derives income in the form of royalty payments from these retail sales.

NFL Charities was created by the Member Clubs for the purpose of funding a wide variety of charitable causes including medical research, community services and drug rehabilitation programs. The sole source of funds for NFL Charities is the revenue received from NFLP directly or through a trust established by the Member Clubs. NFLP has remitted directly or through a trust more than $7 million to NFL Charities. The sale of unlicensed merchandise bearing the NFL marks jeopardizes not only NFLP's licensing program but threatens the contributions available to NFL Charities.

There is not nearly as much to say about the recent interloper that calls itself the New Jersey Giants, Inc. The facts set

forth at pp. 509–10, *supra,* and incorporated herein, make crystal clear defendant's intent and efforts to associate with and capitalize upon the New York Giants. Indeed, the New Jersey Giants, Inc. has engaged in no business other than the sale of unlicensed apparel bearing the mark "New Jersey GIANTS". Defendant's "New Jersey GIANTS" merchandise has been offered for sale and sold at retail outlets, including the Economy Store in Stanhope, New Jersey and Bowling Green Golf Course Pro Shop. Additionally, defendant unsuccessfully attempted to sell its merchandise to the sports apparel buyer for Hermans' World of Sporting Goods' one hundred ten (110) stores, a major source of NFLP licensed merchandise, including that bearing the Giants' marks. Defendant also sold merchandise in the years 1981 to 1984 through direct mail order sales, with 25% of those customers ordering from eight states outside New Jersey.

By letter dated January 4, 1984, NFLP's attorneys requested that defendant cease and desist from the solicitation and sale of "New Jersey GIANTS" merchandise. No response was forthcoming. By letter dated February 13, 1984, NFLP's attorneys advised defendant that it would take legal action if defendant engaged in such conduct in the future. Again, no response was forthcoming. The NFLP presumed that defendant ceased its activities after the NFL football season ended, as consumer demand for merchandise bearing the NFL marks is highest during the NFL football season which begins in August with preseason games and culminates with the NFL Championship Game known as the "Super Bowl" in late January.

But defendant neither ceased its activities nor changed its mark; rather, it escalated its business activities by placing ads on the radio commencing in. the spring of 1984, placing large ads in the "Giants Newsweekly" in May and July 1984, and soliciting Hermans' World of Sporting Goods in the summer of 1984. Shortly before the NFL pre-season games began, NFLP learned that defendant was actively engaged in the advertising, offering for sale, distribution and sale of a line of sportswear bearing the inscription "New Jersey GIANTS" which included t-shirts, mesh shirts, sport shirts, sweatshirts, ¾–length sleeve football shirts, hooded sweatshirts, hats, golf hats, shorts, sweatpants, sweatsuits and windbreakers. The design of every item of defendant's "New Jersey GIANTS" merchandise displayed the word "GIANTS" more prominently than the descriptive geographic term "New Jersey" and used, on all but the earliest manufactured item, navy blue lettering, one of the Giants' team colors.

Defendant's "New Jersey GIANTS" merchandise competes directly with licensed NFL merchandise bearing the New York Football Giants' marks, because NFLP has licensed the same types of merchandise sold by defendant. Moreover, defendant's "New Jersey GIANTS" merchandise is likely to confuse consumers into believing that it is part of the wide array of licensed merchandise sponsored and approved by the New York Football Giants and available to the public through NFLP's licensing program.

But the Giants and NFLP have no control over defendant's business activities or over the nature and clearly inferior quality of the merchandise sold by defendant and, indeed, the quality of that merchandise does not satisfy the quality control standards imposed by NFLP on its licensees. The sale of inferior quality merchandise bearing the NFL marks, or colorable imitations thereof, will adversely affect NFLP's business including the poor impression of the NFL and its Member Clubs that will be held by the consumer.

Because the demand for merchandise bearing the NFL marks is finite, any sales of unlicensed merchandise bearing those marks will cause direct economic harm to NFLP's licensees thus reducing the royalties payable by licensees to NFLP and reducing the size of the fund available for NFL Charities. Defendant's activities in the sale of its "New Jersey GIANTS" merchandise will interfere, as well, with

NFLP's business and cause harm to its reputation and goodwill with licensees and retailers actively promoting the products of NFLP's licensees. If NFLP in unable to abide by its agreement to protect licensees from companies that use the NFL marks without authorization, licensees will lose confidence in the NFLP's licensing program and the value of a license will be impaired thus harming the business of NFLP.

Defendant's use of its trade name and the solicitation and sale of "New Jersey GIANTS" merchandise is also likely to confuse the public into believing that the New York Football Giants has changed the team's name to the New Jersey Giants or does not object to being referred to by that name. Neither is true, of course, and while one may wonder why the New York Giants resist a new name and may wish, perhaps, that it were otherwise, the fact remains that the Giants have the right to retain the long-standing goodwill and reputation they have developed in the name "New York Giants" and efforts in that regard will be undermined were defendant's conduct permitted to continue.

I reach this conclusion without even considering the results of plaintiffs' survey, a survey which demonstrates the existence not merely of likelihood of confusion but of actual confusion on the part of persons exposed to defendant's merchandise bearing the words "New Jersey GIANTS". When that survey is considered, as it properly should be, evidence that was convincing without the survey becomes overwhelming, presumably the reason why defendant has attacked it so vigorously.

Plaintiffs commissioned a consumer survey relating to the merchandising activity of defendant in order to ascertain whether confusion as to the source or sponsorship of defendant's merchandise exists among potential purchasers of such goods. The survey was designed by Dr. Jacob Jacoby and was conducted by Guideline Research Corporation in accordance with the requirements recommended by the Federal Judicial Center and set forth in the *Manual For Complex Litigation,* 116 (5th ed. 1981) and with generally accepted standards of procedure in the field of such surveys. Dr. Jacoby, Professor of Marketing at New York University, has extensive knowledge and experience in the design and interpretation of consumer surveys, and is an expert in those areas. Guideline Research Corporation ("Guideline"), an independent marketing research company that has experience in conducting surveys for legal proceedings, has established quality control procedures to ensure the validity of survey results. Norman Passman, President of Guideline, has market research experience and has been qualified as an expert in other cases in federal courts to render opinions as to the likelihood of confusion based upon surveys designed and conducted by Guideline.

In order to achieve the research goals set by Dr. Jacoby, the survey was designed to determine whether or not potential purchasers of merchandise sold by defendant were likely to be confused as to the source or sponsorship of such merchandise, i.e., whether or not potential purchasers in a shopping context would be likely to believe that the source or sponsor of the defendant's merchandise was the New York Football Giants or the NFL.

In trademark and unfair competition litigation, the results of properly designed and executed consumer surveys have been consistently accepted by courts as probative evidence on the issue of likelihood of confusion. *Union Carbide v. Ever Ready, Inc.,* 531 F.2d 366, 388 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.,* 532 F.Supp. 651, 654, 658 (W.D.Wash. 1982); *Caesar's World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 827 (D.N.J.1980).

The proponent of a consumer survey has the burden of establishing that it was conducted in accordance with accepted principles of survey research, i.e., that (1) a proper universe was examined; (2) a representative sample was drawn from that universe; (3) the mode of questioning the in-

terviewees was correct; (4) the persons conducting the survey were recognized experts; (5) the data gathered was accurately reported; and (6) the sample design, the questionnaire and the interviewing were in accordance with generally accepted standards of procedure and statistics in the field of such surveys. Federal Judicial Center, *Manual For Complex Litigation*, 116 (5th ed. 1981).[3]

The persons within the universe for the consumer study in this case were those 14 years or older who either (1) bought in the past twelve months a t-shirt, sweatshirt or other clothing that had a name, slogan, or picture printed on the front or back, or (2) were likely to buy such an item in the next six months. A sub-universe of professional football fans was selected to provide comparable data.

NFLP and its chief income producing licensee Logo 7 predicate their marketing decisions upon the assumption that apparel items are not purchased by children age 13 and under but rather by adults such as parents or other relatives. Dr. Jacoby and Mr. Passman testified that, based upon their knowledge and experience in the fields of market research and consumer behavior, children age 13 and under rarely purchase apparel items for themselves; such items are purchased by adults. Dr. Jacoby also excluded children age 13 and under from the survey universe because, based on his knowledge and experience in psychology, he believed that children of this age may be able to recognize the NFL trademarks but they are not likely to understand the concepts of "authorization" and "sponsorship".

Defendant's market for its products was almost exclusively for adults; less than $100 dollars of the $4,849.30 of stipulated sales were in youth sizes. Therefore, the proper universe was examined in the survey, i.e., potential purchasers of defendant's merchandise. *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, supra at 657, *citing AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir.1979); Survey Rules *supra*.

The survey was conducted in four shopping malls within the area of concentrated interest assigned by the NFL to the New York Football Giants: two shopping malls are located in the New York metropolitan area consisting of the five boroughs of New York City together with Westchester, Rockland and Putnam Counties; one is located in the New Jersey metropolitan area consisting of Bergen and Passaic Counties, and one is located in the New Jersey metropolitan area consisting of Middlesex, Hunterdon and Somerset Counties. Shopping malls within the Giants' area of dominant influence were chosen to ensure that a cross section of the potential purchasers within such area was tested; age and sex quotas for screening of respondents (and not quotas for respondents themselves) were established proportionate to the population of the area represented.

By conducting the study in four separate shopping malls, each representative of an area of concentrated support for the Giants within the Giants' area of dominant influence, the proponents of the survey tested a representative sample of the relevant uni-

---

**3.** The 1985 edition of the Manual for Complex Litigation has, without explanation, modified the standards for conducting a consumer poll. Specifically, the new Manual states:

> Polls and surveys—a species of sampling that involves interrogation of individuals about such matters as their observations, actions, attitudes, beliefs, or motivations—require special attention. The parties should be required, before conducting any poll, to provide other parties with an outline of the proposed form and methodology, including the particular questions that will be asked, the introductory statements or instructions that will be given, and other controls to be used in the interrogation process. The parties should attempt to resolve any disagreements concerning the manner in which the poll is to be conducted, and a meeting between the experts engaged by the litigants may produce a mutually acceptable plan. Of course, the results and any opinions based on the poll should be disclosed promptly after it has been taken.

*Manual for Complex Litigation* 88, 89 (5th ed. 1985).

The survey at issue here, however, was conducted while the 1981 standards were in effect.

verse. Survey Rules, *supra.* Indeed, ninety-five percent of all consumer market research conducted by personal interviews is tested by mall intercept studies. The results of these studies are used by major American companies in making decisions of considerable consequence.

The interviewing phase of the survey was conducted under Guideline's supervision by three market research service companies whose staffs were given detailed instructions that allowed no discretion in the screening, questioning, recording, and validation procedures. After each respondent was placed in the proper "shopping frame of mind" and was shown three representative articles of defendant's merchandise, he or she was asked a series of neutral, non-leading, non-suggestive, and easily understood questions beginning with general questions, i.e., those seeking the respondent's unaided mental associations, and ending with specific questions, i.e., those seeking respondent's associations with respect to authorization and sponsorship. The mode of questioning was proper and the survey was, thereafter, validated by Centrac, Inc., an independent telephone interviewing service, which successfully recontacted and confirmed the responses of over 50% of the respondents, far exceeding the acceptable level of 15% used in normal industry practice.

Dr. Jacoby reviewed each completed questionnaire and determined that 57.1% of all respondents were actually confused or likely confused as to sponsorship of defendant's merchandise by the Giants or the NFL; 18.7% of all other respondents gave responses that could be interpreted as reflecting possible confusion; and among the sub-universe of fans of professional football, 67% were actually confused or likely confused.[4] The confusion levels at the New Jersey malls (approximately 46%), while lower than the New York malls, represent significant levels of confusion. In Dr. Jacoby's opinion, given the sizeable

percentages of confusion levels that were obtained, the number of individuals in the universe of interest who would be confused (i.e., potential purchasers of defendant's merchandise) is in the millions.

In response to this strong showing, defendant called Dr. Charles S. Keeter who was permitted to testify as an expert in methodology issues in survey research and quantitative research methods for the purpose of attacking plaintiffs' survey. The attack was wholly unsuccessful. It readily became apparent that Dr. Keeter's education and experience were in political science and public opinion polling and that he had no experience in the area of market research in general, much less in consumer confusion in the marketplace or in mall intercept studies. Undoubtedly it was his lack of experience in any area relevant to this case that caused his testimony to be of virtually no use to the court. Thus, after a detailed analysis of plaintiffs' survey, Dr. Keeter incorrectly concluded that the methodology employed was "quota sampling" instead of "quota screening"; in response to a question about his knowledge concerning any error factor considered in non-probability studies, he stated that "he is not familiar with market research studies"; he testified that defendant's sales data should have been considered by Dr. Jacoby in formulating the universe, yet his "expert" report made no mention of this criticism; he attempted to base part of his opinion on the *Wichita Falls* survey, yet he did not know fundamental aspects of the study (such as the number of cells or the stimuli used there); and he stated that the universe in plaintiffs' survey was too broad but that he was not prepared to testify about the sub-universe for football fans which he admitted are more likely purchasers of defendant's products.

### CONCLUSIONS OF LAW

█ It is undisputed that "Giants" and "New York Giants" are valid service marks

---

4. Ten respondents, it now appears, reside outside the Giants' area of dominent influence. Of those ten, six were not confused, one was possibly confused, and three were likely confused.

If one were to delete these responses, the percentage levels of confusion would be even higher.

worthy of protection. Under the common law and the Lanham Act, owners of service marks and owners of trademarks are protected from other marks that are likely to cause confusion. However, assuming the New York Football Giants' marks are not distinctive marks, the Giants only have protection if their marks possessed secondary meaning at the time defendant commenced its use of them. *Scott Paper Company v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228, 1231 (3d Cir.1978), *rev'g* 439 F.Supp. 1022 (D.Del.1977).

> Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin.... [It] is generally established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark. This association suggests that the products originate from a single source.... Once a trademark which could not otherwise have exclusive appropriation achieves secondary meaning, competitors can be prevented from using a similar mark. The purpose of this rule is to minimize confusion of the public as to the origin of the product and to avoid diversion of customers misled by a similar mark. *Id.* at 1228 (citations omitted).[5]

A strong showing of secondary meaning in the marks "Giants" and "New York Giants" has been made.

■ In a case for service mark or trademark infringement and unfair competition, a plaintiff is entitled to a permanent injunction against a defendant by showing that that defendant's activities are likely to confuse consumers as to the source or sponsorship of the goods. *Scott Paper Co. v. Scott's Liquid Gold, Inc., supra* at 1228;

*Salton, Inc. v. Cornwall Corp.,* 477 F.Supp. 975, 989 (D.N.J.1979). In order to be confused, a consumer need not believe that a plaintiff actually produced a defendant's merchandise and placed it on the market. Rather, a consumer's belief that a plaintiff sponsored or otherwise approved the use of the mark satisfies the confusion requirement. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204-05 (2d Cir.1979); *accord, National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc., supra* at 659.

In a suit, as here, involving competing goods, the relevant factors to be considered in a determination as to whether a likelihood of confusion exists are:

(1) The degree of similarity between the owner's mark and the alleged infringing mark;

(2) The strength of the owner's mark;

(3) The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) The length of time the defendant has used the mark without evidence of actual confusion;

(5) The intent of the defendant in adopting the mark;

(6) The evidence of actual confusion.

*Scott Paper Co. v. Scott's Liquid Gold, Inc., supra* 439 F.Supp. at 1036-37; *Caesars World, Inc. v. Caesar's Palace, supra* at 824.

■ Defendant's mark "New Jersey GIANTS" is similar to the Giants' registered marks "New York Giants" and "Giants" and the dominant element of the mark—"Giants"—is identical, rendering those marks particularly confusing. *See e.g. Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 687 F.2d 563 (2d Cir.1982)

---

**5.** Proof of secondary meaning is closely related to proof of likelihood of confusion and, indeed, the Third Circuit in *Scott Paper Company* assumed *arguendo* that proof of the latter is *a fortiori* proof of the former. *Id.* at 1229. There is, however, a distinction. Secondary meaning focuses on the non-*infringing* party's mark and product and the connection the consumer

makes between the product bearing the mark and its source. Likelihood of confusion focuses, in the sponsorship context, on the product bearing the *infringing* mark and whether the consumer believes the product bearing that mark emanates from or is endorsed by the plaintiff.

("Playboy" and "Playmen"); *American Home Products v. Johnson Chemical Co.,* 589 F.2d 103 (2d Cir.1978) ("Roach Motel" and "Roach Inn"); *Pennwalt Corp. v. Becton Dickinson & Co.,* 434 F.Supp. 758 (D.N.J.1977) ("Cruex" and "Jockex"); *Masterpiece of Pennsylvania, Inc. v. Consolidated Novelty Co.,* 368 F.Supp. 550 (S.D. N.Y.1973) ("Mountain King" and "Alpine King"); *Mem Co. v. Hes Co.,* 149 U.S.P.Q. 8 (S.D.Ca.1966) ("English Leather" and "London Leather"). Confusion stems as well from defendant's misuse of the New York Giants' reputation and good will as embodied in the latter's similar marks. A defendant cannot escape the reach of the trademark laws by simply injecting a name in front of the allegedly infringed mark and claiming that this act differentiates or distinguishes the marks regardless of the similarity between or identity of the two marks without inclusion of the new name. *Miller Brewing Co. v. Carling O'Keefe Breweries of Canada, Ltd.,* 452 F.Supp. 429, 444–46 (W.D.N.Y.1978).

The second *Scott* factor is similarly satisfied. Through extensive media coverage and commercial use, the NFL marks, including those of the Giants, are extremely strong, *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc., supra* at 660; *National Football League Properties, Inc. v. Dallas Cap & Emblem Mfg., Co.,* 26 Ill.App.3d 820, 327 N.E.2d 247, 250 (Ill.App.Ct.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 454, 46 L.Ed.2d 390 (1975); *National Football League Properties, Inc. v. Consumer Enterprises, Inc.,* 26 Ill.App.3d 820, 327 N.E.2d 247 (Ill.App. Ct.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 454, 46 L.Ed.2d 390 (1975) and, accordingly, are entitled to a wide range of protection. *Caesars World, Inc. v. Caesar's Palace, supra* at 824–25.

With reference to the third *Scott* factor, the likelihood of confusion in this case is enhanced because both NFLP's licensed apparel bearing the Giants' marks and defendant's apparel, which is the same type of apparel, are low to moderately priced and purchasers will not exercise a high degree of care in determining whether the merchandise has been sponsored or approved by the NFL and the Giants. *Salton, Inc. v. Cornwall Corp., supra* at 991.

Defendant, which only began selling its merchandise in 1982 and had total sales of less than $5000.00 at the time its activities were halted by the restraining order, used the mark without evidence of actual confusion. In establishing the existence of a likelihood of confusion in actions such as this, however, there is no requirement that incidents of actual confusion be shown, *Salton, Inc. v. Cornwall Corp., supra* at 989; *Fotomat Corp. v. Photo Drive-Thru, Inc.,* 425 F.Supp. 693, 703 (D.N.J.1977), and such evidence is unnecessary where other factors so strongly suggest the likelihood of confusion. *Caesar's World, Inc. v. Caesar's Palace, supra* at 827.

However, the consumer survey conducted by Dr. Jacoby and Guideline Research demonstrated substantial actual confusion and a substantial potential for further actual confusion. The results of the survey, which found that over 57% of respondents were actually and likely confused and that football fans were confused in even higher percentages (67%), is extremely strong evidence of likely confusion, *Union Carbide Corp. v. Ever-Ready, Inc., supra* at 388 (55%), and far in excess of the evidence relied upon by courts for this purpose. *See e.g. Exxon Corp. v. Texas Motor Exchange,* 628 F.2d 500 (5th Cir.1980) (15%); *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266 (7th Cir.1976) (15%); *James Burrough Ltd. v. Lesher,* 309 F.Supp. 1154 (S.D.Ind.1969) (11%); *Grotrian, Helfferich Schulz Th. Steinweg Nachf v. Steinway & Sons,* 365 F.Supp. 707 (S.D. N.Y.1973), *modified on other grounds,* 523 F.2d 1331 (2d Cir.1975) (8.5%); 2 McCarthy, *Trademarks and Unfair Competition* § 32:54 at 754. (2d ed. 1984).

Plaintiffs have established that the survey relied upon in this action was conducted in accordance with accepted principles of survey research. It is the type of study employed in the vast majority of market research and relied upon by experts in the

field. Moreover, a non-probability survey, such as the survey in this case, is sufficiently reliable to be admitted into evidence and accorded substantial weight, *Boehringer Ingelheim v. Pharmadyne Laboratories*, 532 F.Supp. 1040, 1053–54 (D.N.J. 1980), and non-probability survey evidence has been accepted by courts in many trademark and unfair competition cases. *American Greetings Corp. v. Dan-Dee Imports, Inc.*, 619 F.Supp. 1204, 1215–16, 1224 (D.N.J.1985); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 845–46 (11th Cir.1983); *Restaurant Lutece, Inc. v. Houbigant, Inc.*, 593 F.Supp. 588, 592–93 (D.N.J.1984); *Selchow & Righter Co. v. Decipher, Inc.*, 598 F.Supp. 1489, 1502–03 (E.D. Va.1984); *Aris-Isotoner Gloves, Inc. v. Fownes Bros. & Co. Inc.*, 594 F.Supp. 15, 23 (S.D.N.Y.1983).

■ Were this a case in which the defendant was acting in good faith, the court would point to the fact that defendant has adduced no survey evidence or testimony from any retailers or merchandisers, and has otherwise failed to provide any credible evidence to rebut plaintiffs' survey results (which corroborate plaintiffs' convincing evidential showing) that demonstrate both secondary meaning and a strong likelihood of confusion arising from defendant's activities. Here, little more need be pointed to than defendant's bad faith.[6]

Defendant's adoption of the mark New Jersey Giants with the hope or expectation that the Giants would acquire such mark from defendant at a profit to defendant and its principals manifests bad faith. Similarly, defendant Giants' bad faith in adopting the mark "New Jersey Giants" is evidenced by the admitted intention of its principals to have consumers associate its mark with the football Giants thereby breaching its duty to select a mark as far afield as possible from well known existing marks such as "New York Giants" and "Giants". *Caesar's World, Inc. v. Caesar's Palace, supra* at 825; *Blue Bell, Inc. v. Maverick Sportswear, Inc.*, 184 U.S.P.Q. 77, 79 (S.D.N.Y.1974). Moreover, defendant's continuation of its activities after receipt of plaintiffs' cease and desist letters constitutes bad faith and is deemed to be an actual and original intention to confuse consumers. *Johnson & Johnson v. Quality Pure Mfg., Inc.*, 484 F.Supp. 975, 979 (D.N.J.1979); *Jockey In't., Inc. v. Burkard*, 185 U.S.P.Q. 201, 207 (S.D.Ca.1975).

■ Defendant's intentional, willful, and admitted adoption of a mark closely similar to the existing marks "Giants" and "New York Giants" manifested not only an intent to confuse but raised the presumption that there was a likelihood of confusion, thus shifting the burden of proof to defendant to establish that there was no likelihood of confusion arising out of the sale of its merchandise bearing the words "New Jersey GIANTS".[7] *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir.1980), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982); *RJR Foods, Inc. v. White Rock Corp., supra* at 1060; *Menley & James Laboratories Ltd. v. Approved Pharmaceutical Corp.*, 438 F.Supp. 1061, 1066–68 (N.D.N.Y.1977); *Amana Society v. Gemeinde Brau, Inc.*, 417 F.Supp. 310 (N.D.Iowa 1976), *aff'd*, 557 F.2d 638 (8th Cir.), *cert. denied*, 434 U.S. 967, 98 S.Ct. 511, 54 L.Ed.2d 454 (1977).

Defendant utterly failed to sustain its burden of proof at trial by failing to present any evidence to rebut the presumption that there was a likelihood of confusion and, for this reason alone, plaintiffs would be entitled to relief. When the appearance of defendant's merchandise and the conduct of defendant in advertising and marketing its merchandise are considered,

---

**6.** The evidence of bad faith is so clear that the court will not even address defendant's offer to accompany prospective use of its infringing mark with a disclaimer.

**7.** Similarly, courts have found a presumption of secondary meaning, unrebutted here, by a showing of deliberate and close imitation of or an attempt to capitalize on a senior user's mark. *See, e.g., RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir.1979); *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir.1960).

the evidence that there is a likelihood of confusion is powerful. *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc., supra; Pennwalt Corp. v. Becton Dickinson & Co., supra.*

■ Defendant's use of the Giants' marks is likely to cause confusion or mistake or deceive purchasers of such merchandise as to the source, sponsorship or approval by the NFL and the Giants. It does not, however, constitute infringement of plaintiff Giants' service mark registrations in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114(1).

■ The services specified in the registration of the Giants' marks were "entertainment services in the form of professional football games and exhibitions." In *National Football League Properties, Inc. v. Witchita Falls Sportswear, Inc., supra* at 654–55, n. 1, the district court concluded that it would be inappropriate to recognize rights under § 32(1) of the Lanham Act because the marks were used as to goods—NFL football jersey replicas—not as to services and that, beyond that, the licensing of shirts "seems" beyond the services specified in the registration of the mark Seattle "Seahawks", the identical services specified here.

■ I agree. While service mark infringement is governed by the same principles as trademark infringement, there is a critical distinction—the distinction between goods and services. "[W]hile a trademark serves to identify and distinguish the source and quality of a tangible product, a service mark functions to identify and distinguish the source and quality of an intangible service." 1 McCarthy, *Trademarks and Unfair Competition*, § 19.29 at 935 (2d ed. 1984 & 1985 Supp.) Here, the marks are used on a variety of goods and not used as to services. Moreover, the licensing and sale of this merchandise is

beyond "entertainment services in the form of football games and exhibitions."

Plaintiffs would have me find that the sale of merchandise bearing the Giants' marks is designed to promote these entertainment services.[8] The testimony, however, is that the professional football games, particularly if the team is successful, promotes the sale of the merchandise; indeed, the sale of the merchandise is a "direct offshoot" of the services the team provides on the field. Perhaps the game promotes the goods but there is nothing before me to suggest that the goods promote the game.

Defendant's use of the Giants' marks does constitute, however, the use of false designations of origin and false description or representation as to the source, sponsorship or approval of such merchandise by the NFL and the Giants in violation of Section 43(a) of the Lanham Act, § 15 U.S.C. 1125(a). *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc., supra; Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., supra; Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc., supra.*

■ New Jersey has codified the common law authority of unfair competition at N.J.S.A. 56:4–1. As observed by the Third Circuit, "[t]he federal law of unfair competition [as codified at § 1125] is not significantly different, as it bears upon this case, from that of New Jersey." *SK & F Company v. Premo Pharmaceutical Lab., Inc.,* 625 F.2d 1055, 1065 (3d Cir.1980). As it bears upon this case, having found liability under § 43(a) of the Lanham Act, judgment will be entered for plaintiffs on the state law claim because defendant's use of the Giants' marks is likely to cause confusion or mistake or to deceive purchasers of such merchandise as to the source, sponsorship, or approval by the NFL and the Giants.

---

**8.** Plaintiffs would also have me follow *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975) and *University of Georgia Athletic Ass'n v. Laite,* 756 F.2d 1535 (11th Cir.1985). I decline to do so. In the former case, the court did not discuss the distinction between services and goods; in the latter case, § 43(a) of the Lanham Act was at issue and not § 32(1).

Such conduct is also in violation of N.J.S.A. 56:3–13.11.

 Defendant's conduct constitutes, as well, a tortious misappropriation of the goodwill and reputation of NFLP, the NFL and the Giants. *Standard & Poor's Corp. v. Commodity Exchange, Inc.,* 683 F.2d 704, 710 (2d Cir.1982); *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76 (2d Cir.1981); *Columbia Broadcasting System, Inc. v. Melody Recordings, Inc.,* 134 N.J. 368, 341 A.2d 348 (App.Div.1975). *See generally United States Golf Ass'n v. St. Andrews Systems,* 749 F.2d 1028 (3d Cir.1984).

 Defendant's conduct further constitutes tortious interference with the business relationships of NFLP, the NFL and the Giants with NFLP's licensees, with retailers of licensed merchandise and with the ultimate consumers of licensed merchandise. *Raul International Corp. v. Sealed Power Corp.,* 586 F.Supp. 349, 358 (D.N.J.1984) *citing Inventive Music, Ltd. v. Cohen,* 617 F.2d 29, 34 (3d Cir.1980).

 The likelihood of confusion caused by defendant's conduct establishes that plaintiffs have been and will be irreparably harmed absent injunctive relief. Remedying the likelihood of confusion in the marketplace arising from defendant's conduct will protect the public interest. Plaintiffs are, therefore, entitled to a judgment and decree as follows:

1. That defendant New Jersey Giants, Inc., its respective officers, directors and shareholders, and its agents, representatives, attorneys and all persons acting in concert or in participation with it or them are hereby permanently enjoined and restrained from the following:

a) using on or in connection with the manufacture, sale, offering for sale, distribution, advertisement, labeling or packaging of any articles of merchandise the designation NEW JERSEY GIANTS or GIANTS or any other designation which is a colorable imitation of or confusingly similar to the plaintiff Giants' marks GIANTS and NEW YORK GIANTS.

b) representing by any method whatsoever that any articles of merchandise sold by defendant are sponsored or authorized by, or originate with, the NFL or the Giants, or their exclusive licensee NFLP, or otherwise taking any action likely to cause confusion, mistake, or deception on the part of buyers as to the origin or sponsorship of such merchandise.

c) using in connection with its business the corporate name NEW JERSEY GIANTS, INC. or any other name which is a colorable imitation of or confusingly similar to the plaintiff Giants' marks GIANTS and NEW YORK GIANTS.

2. That within thirty (30) days from the date hereof, pursuant to N.J.S.A. 14A:2–2(5) and N.J.S.A. 56:3–13.8(d)(5), defendant shall file the necessary documents with the New Jersey Secretary of State to:

a) change its corporate name from NEW JERSEY GIANTS, INC. to a name in accordance with this decree and

b) request a cancellation of its service mark registration for "NEW JERSEY GIANTS."

3. That defendant deliver to the court, within ten (10) days from the date hereof, satisfactory evidence that any and all merchandise, stationery, business cards, merchandise packages, labels, advertisements, brochures or other advertising and promotional literature presently in the possession, custody or control of defendant bearing the designation NEW JERSEY GIANTS, or GIANTS and all devices for making same, has been destroyed.

4. That a hearing shall be set by the court to determine the quantum of an accounting of profits, damages, attorneys' fees, and costs due plaintiffs from defendant New Jersey Giants, Inc. Pending further order of the court, upon such hearing, no disposition of any asset of defendant is to be made.

Plaintiffs are to submit an order reflecting this opinion within ten days.