**NATIONAL FOOTBALL LEAGUE PROPERTIES, Plaintiff,**

v.

**PLAYOFF CORPORATION, Defendant.**

**Civ. A. No. 3:92–CV–2387–X.**

United States District Court,
N.D. Texas,
Dallas Division.

Dec. 17, 1992.

---

Tyler Alexander Baker, III, Stephen James Pierce, Jr., Carrington Coleman Sloman & Blumenthal, Dallas, TX, Sanford M. Goldman, Tom J. Ferber, Pryor Cashman Sherman & Flynn, New York City, for plaintiff.

Ralph I. Miller, Nicholas Andrew Foley, Lawrence D. Stuart, Weil Gotshal & Manges, Dallas, TX, Norman H. Zivin, Donna A. Tobin, Cooper & Dunham, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KENDALL, District Judge.

NOW before the Court is Plaintiff's Motion For Temporary Restraining Order And

Preliminary Injunction, filed on November 18, 1992. Having denied Plaintiff's motion for a temporary restraining order at a hearing held on November 25, 1992, the Court now turns its attention to Plaintiff's motion for preliminary injunction and determines that it also should be, and hereby is, DENIED.

## I.

This is a trademark infringement case, which arises under the Lanham Act, 15 U.S.C. §§ 1051–1127, as well as under state common and statutory law.[1] Plaintiff, the exclusive licensing representative for National Football League trademarks, complains of Defendant's plan to market football trading cards depicting various professional football players in actual game settings in which the players wear their uniforms and, sometimes, helmets. Plaintiff licenses the NFL marks as well as the names, likenesses and personal data of some players, while the National Football League Players Association licenses the names, likenesses and personal data of other players but does not license the actual NFL marks. Defendant has developed and is in the process of patenting a technology for trading card production using foil as the basic medium, in which the background of a card appears in black and white with a metallic finish while players appear foregrounded in color.

In the spring of 1992, Defendant began negotiations with the Players Association to use the names, likenesses and data of Association players. These negotiations ended in the granting of a license, for which Defendant has paid $1.9 million; there are two extensions to follow, one at $1.2 million and another at $1.3 million. In late August of 1992, Defendant approached Plaintiff and sought a license to use the names, likenesses and personal data of Plaintiff's players and to use trademarked NFL logos. It was Defendant's intention to display on trading cards the players for whom it was licensed along with NFL team logos depicted separately from the players on the cards. Players would also appear in their team uniforms complete with any NFL or team marks that are attached to the uniforms. Plaintiff, however, declined to grant Defendant a license for either the names and likenesses or for the NFL marks. Defendant then abandoned intentions to use NFL team logos depicted separately from the actual players and changed the appearance of its cards, removing the TEAM NFL logo, adding disclaimers to packaging and removing team names. Promotional cards do, however, continue to display players in their uniforms, although Defendant has tried to minimize the appearance of team and NFL logos on the uniforms and helmets. Defendant displays only players for whom it has been licensed through the Players Association and does not display players licensed through Plaintiff. Plaintiff claims that displaying players in their uniforms at all constitutes infringement, while Defendant characterizes the depictions as incidental or fair use. Defendant has distributed promotional materials for its cards, has received orders and intends to ship its cards on December 21, 1992.

## II.

Plaintiff asserts two claims under the Lanham Act. The first is for trademark infringement under 15 U.S.C. § 1114, and the second is for unfair competition under 15 U.S.C. § 1125(a). Ordinarily, the same set of facts enabling a plaintiff to recover under Section 1114 will enable recovery under Section 1125. *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir.1985). Additionally, Plaintiff asserts causes of action arising under Texas law for unfair competition under the common law, trademark infringement under Section 16.26 of the Texas Business & Commerce Code as well as dilution of the distinctive quality of a mark pursuant to Section 16.29 of the Texas Business & Commerce Code. In its answer, Defendant denies, among other things, that Plaintiff has

---

**1.** The following facts come from the complaint and the transcript of the temporary restraining order hearing conducted on November 25, 1992.

any right to enforce the marks in question in its own name[2] and denies that it has made any trademark use of any marks asserted in the complaint. Defendant asserts further that any use of the marks at issue is a fair use or an incidental use, or both.

## III.

In order to obtain the extraordinary relief that it seeks, Plaintiff must satisfy four stringent criteria. Specifically, Plaintiff must show that it is substantially likely to succeed on the merits of its claim, that the Court's failure to issue the injunction poses a substantial threat of irreparable injury, that the threatened injury outweighs any damage that the injunction's issuance might cause to the opposing party and that the injunction's issuance will not undermine the public interest. *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990); *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989). These elements are mixed questions of law and fact. *Blue Bell Bio–Medical v. Cin–Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir.1989). A preliminary injunction should be granted only if the movant has clearly carried the burden of persuasion regarding all four factors. *Allied Mktg. Group, Inc.* 878 F.2d at 809. A district court's determination of a preliminary injunction motion will be reversed only if the court abuses its discretion. *Blue Bell Bio–Medical*, 864 F.2d at 1256. In the abuse of discretion analysis, the court's fact findings will be overturned only if clearly erroneous. *Id.; Apple Barrel Prods., Inc. v. R.D. Beard*, 730 F.2d 384, 386 (5th Cir.1984).

### a.

 Substantive law provides the standards for the likelihood of success on the merits determination, *Roho, Inc.*, 902 F.2d at 358, and the Court therefore proceeds to issues arising thereunder. Trade-

mark infringement rests on the notion that a particular use of a registered trademark is likely to cause confusion, 15 U.S.C. § 1114(1)(a), and because trademark cases often involve line drawing in areas of which the points of distinction are inherently indistinct, *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1182 (5th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981), the United States Court of Appeals for the Fifth Circuit has reduced the trademark inquiry to two basic questions: Whether the plaintiff has a protectable right in its mark, and, if so, whether there is infringement as judged by the likelihood of confusion. *Security Ctr., Ltd. v. First Nat'l Sec. Ctrs.*, 750 F.2d 1295, 1298 (5th Cir.1985). Several courts have already determined that NFL marks have accrued secondary meaning and are therefore protectable. *See, e.g., National Football League Properties, Inc. v. New Jersey Giants, Inc.*, 637 F.Supp. 507, 511 (D.N.J.1986); *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651, 658–59 (W.D.Wash.1982). The Court therefore concludes that NFL marks are protectable.

The likelihood of confusion test focuses on whether a defendant's use of a plaintiff's trademark would likely create confusion in the minds of potential buyers as to the source, affiliation or sponsorship of the parties' products. *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 170 (5th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). To determine likelihood of confusion, one considers a variety of factors, including the strength of a trademark at issue, similarity of design, similarity of product, identity of retail outlets and purchasers, identity of advertising media used, the defendant's intent and actual confusion. *Soweco, Inc.*, 617 F.2d at 1185. These are the so-called "digits of confusion" criteria. Proof of

**2.** Despite Defendant's contention to the contrary, Plaintiff has standing to bring suit regarding the marks at issue in its own name. Plaintiff has the right to enforce the marks pursuant to a license agreement with the NFL Trust. (Flood Aff. at ¶ 8.) The member clubs of the NFL, owners of the marks, have granted to the

NFL Trust all rights to the use of the NFL marks. (*Id.*) The license agreement between the Trust and Plaintiff clearly contemplates that Plaintiff may bring suit against infringers of marks entrusted to the Trust. (Flood Aff. Ex. B at Article VI ¶ B.)

actual confusion is unnecessary; rather, the likelihood of confusion is the determinative factor, and this question is one of fact. *Id.* at 1186. None of these factors by itself is dispositive; different factors will weigh heavier from case to case depending on facts and circumstances involved. *Marathon Mfg. Co.*, 767 F.2d at 218. The Court must also consider defenses that the Defendant raises because their success or lack of success may impact the likelihood of success on the merits. *See Allied Mktg. Group, Inc.*, 878 F.2d at 811–12 (case remanded for determination of defenses in copyright case in preliminary injunction context).

Because NFL marks have accrued secondary meaning as noted above, the Court concludes that the marks are strong. This determination is conclusive of the first digit of the digits of confusion test, and the Court therefore continues its analysis with the second digit. Regarding similarity of design, the Court must not view marks in isolation, but rather must look at the marks in their entirety, not merely at individual similar features. *Oreck Corp.*, 803 F.2d at 171; *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 502 (5th Cir.1979), *cert. denied*, 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979). As Defendant's president admitted at the hearing on Plaintiff's motion for a temporary restraining order, some of Plaintiff's logos will be visible on at least some of Defendant's cards. Clearly, Defendant's president was not referring to similar logos but rather to the actual NFL logos. She also notes that players will appear in their uniforms. Once again, these are not uniforms similar to those that players wear during actual play; they are the actual uniforms. It must therefore be concluded that there is not merely similarity of design, there is sameness of design.

The third digit involves similarity of product. The greater the similarity between the products and services, the greater the likelihood of confusion. *Moore Business Forms, Inc. v. Ryu*, 960 F.2d 486, 490 (5th Cir.1992); *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir.1980). The Court is guided in this analysis by the overarching principle that the likelihood of confusion test focuses on whether a defendant's use of a plaintiff's trademark would likely create confusion in the minds of potential buyers as to the source, affiliation or sponsorship of the parties' products. *Oreck Corp.*, 803 F.2d at 170. The question necessarily arises, buyers of what? The purchasers who may be confused by any infringement would be purchasers dealing in products like Defendant's and must therefore be purchasers of football trading cards. The relevant product to compare with Defendant's in this analysis is, then, football cards containing Plaintiff's trademarks. Although Defendant's products may be marginally dissimilar from other football trading cards because of the process in which they are manufactured and the currentness of player information, they are at least substantially similar to other football trading cards.

The fourth digit concerns the identity of retail outlets and purchasers. Dissimilarities between retail outlets lessen the possibility of confusion, mistake or deception. *Moore Business Forms, Inc.*, 960 F.2d at 490. Because the Court's analysis focuses on football trading cards, it is clear that Defendant's cards and competing cards will be distributed through the same retail outlets to the same purchasers and will compete in the same market.

The fifth deals with the identity of advertising media used. Once again, Defendant's product will be advertised through the same media as other cards in order to reach the same potential purchasers as other cards.

The sixth digit pertains to a defendant's intent. Although Plaintiff's filings are replete with allegations of bad faith on Defendant's part, the Court concludes that Defendant's actions evidence no ill intent to appropriate Plaintiff's marks or to capitalize on Plaintiff's good will. Although it is true that Defendant's prototype cards that were sent to Plaintiff before Plaintiff denied the license depict NFL marks prominently, Defendant changed the appearance of its cards in reaction to Plaintiff's denying of the license. The cards that Defen-

dant intends to produce minimize the use made of the previously prominent marks, and this reaction is congruent with an intent not to appropriate but rather to identify depicted football players as football players in their working environment as Defendant's president explained at the TRO hearing. Nor does the Court find persuasive Plaintiff's allegations of bad faith regarding the timing of Defendant's purchase of its license from the Players Association. The Court finds that it is not the case that Defendant purchased its license from the Players Association months before entering into negotiations with Plaintiff for a license, all with the intent to use Plaintiff's marks whether Plaintiff granted a license or not. Instead the Court finds that Defendant did not consummate its license with the Players Association until after Plaintiff had denied the license and that Defendant's plan to continue to produce cards depicting players in actual game settings was motivated at least in part by a belief that any use of Plaintiff's marks was a fair or incidental use.

The seventh digit regards the extent of actual confusion. Evidence of actual confusion is often the best evidence of likelihood of confusion. *Moore Business Forms, Inc.,* 960 F.2d at 491. `There is however no actual confusion because the cards have yet to go on the market.

The analysis regarding likelihood of confusion is not at an end, however, for the Court must address Defendant's relevant defenses. As noted above, Defendant's complaint that Plaintiff does not have standing to bring this suit in its own name is without merit. Another of Defendant's defenses, that of fair use, while at first blush attractive, appears to be unavailable in this circuit on these facts. The defense is available only when the allegedly infringing term is used not as a trademark but

fairly and in good faith to describe to users the goods and services of a party. *Soweco, Inc.,* 617 F.2d at 1185. Two other prerequisites to the defense's availability are that the action must involve descriptive terms,[3] and any use must be as a description rather than as a trademark. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 791 (5th Cir.1983). Because the marks involved here are more in the nature of fanciful or arbitrary[4] rather than descriptive, a plain meaning analysis of the quotation above from *Zatarains, Inc.* reveals that even if the marks are used descriptively, the defense remains unobtainable because the marks themselves are not descriptive marks.

This conclusion is troubling, though, because it does not follow that fanciful marks—even marks that do not operate to convey meaning through language, the colors and shapes on a football uniform, for instance—cannot be used descriptively and for the purpose of identification. The Court acknowledges Defendant's invitation to adopt the rationale of a recent Ninth Circuit case, *New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302 (9th Cir.1992). In *New Kids,* the court, *per* Judge Kozinski, stated that "where the defendant uses a trademark to describe the plaintiff's product, rather than its own, we hold that a commercial user is entitled to a nominative fair use defense provided he meets the following three requirements: First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *Id.* at 308. Although the Court notes that Defendant could fulfill the *New Kids* test

---

**3.** In trademark parlance, a descriptive term identifies a characteristic or quality of an article or service, as, for example, its color, odor, function, dimensions or ingredients. *Soweco, Inc.,* 617 F.2d at 1183–84. An example of a descriptive term would be "Vision Center" in reference to a place at which one purchases eyeglasses. Another example is the term "EVERREADY" in reference to batteries or light bulbs. *Id.* at 1184.

**4.** Arbitrary or fanciful terms bear no relationship to the product or service with which they are associated. *Soweco, Inc.,* 617 F.2d at 1184. An example of such a term is "Kodak" as applied to film products. *Id.*

and that the rationale underlying that decision is attractive, it is for the Fifth Circuit and not this Court to adopt or not that holding or rationale, or both.[5]

Defendant also posits the First Amendment as a bar to Plaintiff's action, stating that the newsworthiness of information on its cards would render preliminary injunctive relief a prior restraint. Although initially plausible, Defendant's argument would ultimately allow the First Amendment to swallow trademark infringement law in one gulp. To accept Plaintiff's argument would be to allow any infringer to deliver "newsworthy" information on a T-shirt or other commercial article while at the same time displaying trademarks belonging to another and claim that preliminary injunctive relief before shipment of the merchandise constitutes prior restraint. This situation would be patently untenable. Defendant's cards are more in the nature of merchandise rather than a magazine. Purchasers, while buying a SPORTS ILLUSTRATED primarily for newsworthy information, would be likely to buy Defendant's cards for possible appreciation in value and for their ability to trade cards with fellow enthusiasts—"trading cards"—as well as for information contained on the cards.[6] The Court therefore concludes that Defendant's First Amendment defense does not mitigate against a finding of substantial likelihood of success on the merits, and for the foregoing reasons, the Court determines that Plaintiff has made the requisite showing on this first prong of the preliminary injunction analysis.

b.

▉▉▉▉ In addition to showing a substantial likelihood of success on the merits in a quest for preliminary injunctive relief, a plaintiff must show that a court's failure to issue the injunction would leave the plaintiff irreparably harmed. Generally, an injury is considered irreparable only if it cannot be remedied by monetary damages. *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir.1983). Indeed, the fact that adequate compensatory damages would ultimately be available in the normal course of litigation weighs heavily against a finding of irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974). As Plaintiff notes, " '[s]ome courts find sufficient irreparable injury to grant a preliminary injunction in a trademark case when plaintiff shows that, pending trial, he will lose control of his reputation because it rests upon the quality of the defendant's activities as a result of a likelihood of confusion of purchasers....' " (Mem.Law Supp. Pl.'s Mot. T.R.O. & Prelim. Inj. at 20, *citing* 2 J. Thomas McCarthy, TRADEMARK AND UNFAIR COMPETITION § 30:18 (2d ed. 1984).) One could not say with a straight face that NFL Properties would lose control of its reputation if an injunction does not issue under the facts of this case. Although Plaintiff argues that trademark infringement entitles one *ipso facto* to preliminary injunctive relief, Plaintiff refers the Court to no Fifth Circuit case so holding, and its assertion that irreparable harm will result absent an injunction, *see* Flood Aff. at ¶¶ 3–6, amounts to a tenuous, insubstantial or remote possibility of irreparable harm.[7] The Court finds that the possibility of irreparable harm occurring would be slight should the failure to

---

5. The Court also notes that Defendant's descriptive use of Plaintiff's marks may describe Defendant's own product—the football players for whom Defendant is licensed—rather than Plaintiff's product as in *New Kids*.

6. *Cf. Hicks v. Casablanca Records:* "[M]ore so than posters, *bubble gum cards*, or some other such 'merchandise,' books and movies are vehicles through which ideas and opinions are disseminated and, as such, have enjoyed certain constitutional protections, not generally accorded 'merchandise.' " 464 F.Supp. 426, 430 (S.D.N.Y.1978) (emphasis added).

7. In fact, the Fifth Circuit on more than one occasion has declined to presume the existence of irreparable harm. *See, e.g., Plains Cotton Coop. Assoc. v. Goodpasture Computer Serv., Inc.,* 807 F.2d 1256, 1261 (5th Cir.1987), *cert. denied,* 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987) ("At oral argument, appellant ... assert[ed] that irreparable injury is presumed upon a finding of likelihood of success on the merits. That rule, however, is not established in this circuit. On the contrary, we have made it clear in our decisions that preliminary injunctions will be denied based on a failure to prove separately each of the four elements of the four prong test for obtaining the injunction."); *Apple*

issue an injunction have been in error. Instead, the Court finds that monetary damages would be adequate recompense and that Defendant would be able to pay resulting damages.

c.

In a preliminary injunction analysis, the Court must identify the harm that such an injunction might cause the defendant and weigh it against the plaintiff's threatened injury. *Allied Mktg. Group., Inc.*, 878 F.2d at 809. Where the defendant's likely harm if the injunction is granted is equal to or greater than any injury threatened by defendant's conduct, injunctive relief is generally denied. *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 389–90 (5th Cir.1984). As noted above, the Court finds that harm resulting to Plaintiff if an injunction erroneously failed to issue would not be substantial. The Court finds that harm resulting to Defendant would be substantial, destructive, perhaps fatal to Defendant as Defendant now exists. Defendant's president attested at the TRO hearing that such an injunction would force Defendant from the football trading card market and that Defendant would probably be forced to change its name. On balance, the Court determines that the harm that would accrue to Defendant should an injunction issue would greatly outweigh harm resulting to Plaintiff should the injunction not issue.

d.

The Court further determines that failure to issue an injunction does not offend the public interest.

IV.

For the foregoing reasons, the Court determines that Plaintiff's motion for a preliminary injunction should be, and hereby is, DENIED.

SO ORDERED.

*Barrel Prods. Inc., v. Beard*, 730 F.2d 384, 390 (5th Cir.1984) ("This Court has not expressed a view on whether a presumption of irreparable injury ... as a matter of law is appropriate after a substantial likelihood of success on the merits is shown.")