**COMMERCE BANCORP, INC., Plaintiff,**

v.

**BANKATLANTIC, Defendant.**

**Civil No. 02–4774(JBS).**

United States District Court, D. New Jersey.

Sept. 25, 2003.

478

Timothy D. Pecsenye, Esquire, Dennis P. McCooe, Esquire, Jennifer L. Miller, Esquire, Blank, Rome LLP, Cherry Hill, NJ, for Plaintiff Commerce Bancorp, Inc.

William L. Mentlik, Esquire, Roy H. Wepner, Esquire, Lerner, David, Littenberg, Krumholz & Mentlik, LLP, Westfield, NJ, and Eugene E. Stearns, Esquire, Jay B. Shapiro, Esquire, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, Miami, FL, for Defendant BankAtlantic.

## *OPINION*

SIMANDLE, District Judge.

This motion comes before the Court upon defendant BankAtlantic's motion for summary judgment on plaintiff Commerce Bancorp, Inc.'s claims for infringement and unfair competition relating to the mark AMERICA'S MOST CONVENIENT BANK. Defendant BankAtlantic, which uses the slogan FLORIDA'S MOST CONVENIENT BANK, operates its business in the state of Florida, approximately 1000 miles from Commerce's four-state territory of New Jersey, New York, Delaware, and Pennsylvania. Defendant argues that there would be no actionable infringement of Commerce's mark AMERICA'S MOST CONVENIENT BANK

even if the parties operated in the same territory, that Commerce cannot obtain relief where the use of the two slogans are in geographically distinct regions, and that Commerce cannot establish a likelihood of confusion among its purchasers.

For the reasons discussed herein, defendant BankAtlantic's motion for summary judgment will be granted.

## I. *BACKGROUND*

Plaintiff Commerce is a provider of banking, mortgage, insurance, investment, and related financial services. (Amended Compl. ¶ 8.) Commerce, founded in 1973 with a single branch in Marlton, New Jersey, has grown to be a full service financial institution, with $10 billion in customer deposits, over $11 billion in assets, over $4.5 billion in loans, and net income of $103 million in 2001. (DiFlorio Aff. ¶¶ 1–2.) As of December 31, 2001, Commerce's banking subsidiaries operated 184 bank branches throughout the mid-Atlantic region, including New Jersey, Pennsylvania, New York and Delaware, with 41 more branches to open in 2002. (*Id.* ¶ 3.) Approximately 3,500 of its customers reside in Florida, however. (*Id.*) In 1997, Commerce had almost $14 million in Florida deposits and $5.10 million in Florida loans. (Chart, Second Suppl. DiFlorio Aff. Ex. F.) That number grew to $23.34 million in Florida deposits and $18.83 million Florida loans in 2001, and $48.17 million in Florida deposits and $29.92 million in Florida loans in 2002. (*Id.*)

Commerce also wholly owns an insurance subsidiary Commerce National Insurance Services, Inc. ("CNIS"), which is an insurance brokerage with annual premium volume of $600 million and over 125,000 customers. (DiFlorio Aff. ¶ 5 & Ex. A, at 34.) In addition, Commerce has an online Internet banking service, Commerceonline.com. (*Id.* ¶ 6.) In 2001, over 30% of Commerce's households utilized Commerce Online. (*Id.* & Ex. A.) Over 165,000 customers used Commerce Online banking services in 2001. (*Id.*)

The AMERICA'S MOST CONVENIENT BANK mark was registered on the Supplemental Register in the United States Patent and Trademark Office on June 19, 2001. (Certificate of Registration, Amended Compl. Ex. A.) Plaintiff alleges that the company and its subsidiaries have been continuously, extensively and exclusively using the AMERICA'S MOST CONVENIENT BANK mark to promote its financial services since February 1996, in connection with the above services. (*Id.* ¶ 9.) Commerce also alleges that it is the owner of all right, title and interest to the mark and to the federal service mark registrations.[1] (*Id.* ¶ 10; Certificate of Registration, Amended Compl. Ex. A.)

Defendant BankAtlantic is also a provider of banking and related financial services. (Amended Compl. ¶ 22.) BankAtlantic currently has 72 branches, all of which are located within eight counties of Florida: Miami–Dade, Broward, Palm Beach, Martin, Indian River, St. Lucie, Hillsborough, and Pinellas. (Jarett Levan

---

**1.** Commerce recently filed an Amended Complaint in which Plaintiff also alleges that as early as 1999, it began using the WOW! marks in connection with financial services, including banking, capital markets and insurance. (Amended Compl. ¶ 13.) Commerce subsequently applied for numerous registrations of various WOW marks with the U.S. Patent and Trademark Office. (*Id.* ¶¶ 14–18.) The marks WOW ANSWER GUIDE, and the WOW ANSWER GUIDE and Design, were registered on May 21, 2002 and May 28, 2002, respectively. (*Id.* ¶¶ 14–15.) Plaintiff alleges it is the owner of all right, title and interest in the WOW! family of marks and in the federal service mark registrations. (Amended Compl. ¶ 19.)

Decl. ¶ 2.) BankAtlantic maintains and operates approximately 140 ATMs in the state of Florida, the majority being in the eight counties referred to above, while a small number are in remote locations, including military bases, shopping centers, and baseball stadiums. (*Id.* ¶ 3.) In 2002, defendant derived over $1.1 billion of its total accounts, more than 20% of its revenues, from customers who reside outside Florida. (Chart, Miller Decl. Ex. 11.) As of December 31, 2002, 95% of defendant's customers were residing in Florida, although defendant had deposit accounts valued at more than $80 million from customers having addresses in New Jersey, New York, Pennsylvania, and Delaware.[2] (*Id.*; Chart, Miller Decl. Ex. 11.)

Defendant launched a new advertising campaign using the service mark FLORIDA'S MOST CONVENIENT BANK as a promotional vehicle for its banking operations in Florida, on approximately April 1, 2002. (J. Levan Decl. ¶ 4.) Prior to that date, on February 12, 2002, plaintiff's counsel sent a letter to defendant notifying it of plaintiff's preexisting rights in the AMERICA'S MOST CONVENIENT BANK mark and demanding that it cease and desist the use of its FLORIDA'S MOST CONVENIENT BANK mark immediately. (Amended Compl. ¶ 24; Wiseman Letter, 2/12/02, Amended Compl. Ex. J.) Defendant responded to plaintiff in its letters dated February 21 and April 5, 2002, stating that it would not comply with plaintiff's demands. (Amended Compl. ¶ 25.)

Plaintiff Commerce filed this civil action on October 2, 2002, alleging that defendant BankAtlantic's use of the phrase FLORIDA'S MOST CONVENIENT BANK infringes upon Commerce's mark AMERICA'S MOST CONVENIENT BANK.

(Compl.) Plaintiff's Amended Complaint also alleges claims related to its WOW! family of marks. (Amended Compl.) Plaintiff alleges that defendant launched an advertising campaign that prominently featured the FLORIDA'S MOST CONVENIENT BANK mark on April 1, 2002, and subsequently began using the mark in commerce in connection with its goods and services. (*Id.* ¶ 26.) Plaintiff also contends that defendant copied plaintiff's general methods of business, including offering services such as "Seven Day Branch Banking," "Totally Free Checking," and extended banking hours. (*Id.* ¶ 27.) Plaintiff asserts that defendant's use of FLORIDA'S MOST CONVENIENT MARK is part of an intentional scheme to confuse consumers by implying that defendant's services were affiliated with or sponsored or authorized by Commerce, that it violates plaintiff's rights in the mark, and that it is likely to cause confusion or mistake as to the source or association of the goods and services being offered. (*Id.* ¶¶ 28–30.) As for the WOW! mark, plaintiff similarly alleges that defendant copied Commerce's WOW! mark and adopted a colorable imitation thereof as its service mark. (*Id.* ¶ 32 & Ex. L.)

Plaintiff in its Amended Complaint brings four counts regarding defendant's use of the AMERICA'S MOST CONVENIENT BANK mark and WOW! family of marks: infringement of a federally registered service mark under the Lanham Act, 15 U.S.C. § 1114 (Count I); false designation of origin, false description and false representation in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count II); infringement of a common law mark under the Lanham Act, 15 U.S.C. § 1125(a) (Count III); and common law unfair com-

---

2. New Jersey customers accounted for $34.4 million; New York for $35.7 million; Penn-

sylvania for $11.1 million, and Delaware for $324,189. (Chart, Miller Decl. Ex. 11.)

petition (Count IV). (Amended Compl. ¶¶ 42–70.)

On November 7, 2002, Commerce filed a motion for preliminary injunction, which has since been withdrawn, as consented to by plaintiff. (Motion, 11/7/02; Order, 1/24/03.) On November 18, 2002, defendant filed its Answer. (Answer, 11/18/02.)

Defendant BankAtlantic moved for summary judgment on January 8, 2003, arguing that the geographic distance between the regions using the two marks precludes the finding of any acquired secondary meaning of the AMERICA'S MOST CONVENIENT BANK mark in Florida. Defendant further argues that there can be no likelihood of confusion because there is no territory in which the consuming public is exposed to both Commerce's use of the AMERICA'S MOST CONVENIENT BANK mark and BankAtlantic's use of the FLORIDA'S MOST CONVENIENT BANK slogan. Plaintiff cross-moved to continue or dismiss defendant's summary judgment motion.

After a telephone conference with this Court on January 24, 2003, Commerce withdrew its preliminary injunction motion. On that date, the Court set a briefing schedule regarding supplemental submissions for defendant's summary judgment motion, allowed discovery to extend to the WOW! mark, and granted plaintiff's motion for continuance.[3] (Scheduling Order, 1/24/03.) Meanwhile, as mentioned above, plaintiff on January 28, 2003, moved for leave to amend its Complaint to add allegations regarding its WOW! family of marks, which this Court granted on May 19, 2003. (Order, 5/19/03.) Defendant also moved for leave to file an Amended Answer to raise an additional defense, and that motion was granted by Magistrate Judge Rosen, also on May 19, 2003. (J. Rosen Order, 5/19/03.) Plaintiff Commerce filed its Amended Complaint on May 22, 2003. (Amended Compl.)

This Court heard oral argument on defendant's summary judgment motion on May 30, 2003.

## II. *DISCUSSION*

Defendant BankAtlantic in its summary judgment motion argues that there is no actionable infringement even if the parties operated in the same territory on grounds that, *inter alia*, the mark is not susceptible to achieving trademark significance, there is no direct evidence of secondary meaning, and actual confusion between the two marks is absent.[4] Additionally, defendant

---

3. Plaintiff's cross-motion to continue or dismiss defendant's summary judgment motion sought a continuance of such motion "until such time as discovery in this matter is complete or, in the alternative, for an Order dismissing Defendant's Motion for Summary Judgment without prejudice to Defendant's right to refile the motion after the close of all discovery in this matter." Pl.'s Cross-Motion, at 1. The Court's Scheduling Order of January 24, 2003 had granted plaintiff's cross-motion for a continuance, allowing discovery to proceed until March 28, 2003. To the extent that plaintiff's cross-motion to dismiss defendant's summary judgment motion may still be pending, the Court will dismiss such cross-motion to dismiss as moot, given that the entirety of the summary judgment papers were submitted after the close of discovery in this case, and particularly given the fact that the scheduling orders, *see* Order, 3/31/03, and telephone conferences with the parties subsequent to the filing of plaintiff's cross-motion specifically provided for this to occur.

4. Defendant moves for summary judgment pursuant to Rule 56(a), Fed.R.Civ.P. A court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). A dispute is "genuine" if "the evidence is such that a reasonable jury could

argues that the geographic distance between the two regions using the marks precludes secondary meaning, and that Florida was and is not in Commerce's "zone of natural expansion." Lastly, defendant argues that Commerce cannot establish a likelihood of confusion among its consumers, and that Commerce cannot obtain relief until and unless its entry into the Florida market is imminent, notwithstanding the *"Tea–Rose Rectanus"* doctrine.

### A. *Trademark Infringement Claim*

 Defendant raises a number of arguments with respect to plaintiff's trademark infringement claims. It asserts that there is no direct evidence of secondary meaning of the mark, which is only registered on the Supplemental Register, relying on *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 440–41 (3d Cir.2000), and *J & J Snack Foods Corp. v. Earthgrains Co.*, 220 F.Supp.2d 358, 380 (D.N.J.2002). A plaintiff with a federal trademark infringement claim under 15 U.S.C. § 1114 or a federal unfair competition claim under 15 U.S.C. § 1125(a) must prove that (1) its mark is valid and legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services. *J & J Snack Foods*, 220 F.Supp.2d at 374 (citations omitted); *see also A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,

237 F.3d 198, 210 (3d Cir.2000) (noting that the standards for proving either Lanham Act violation are identical) (citations omitted). The same standards apply to claims brought under 15 U.S.C. § 1125 for unfair competition, as well as to claims for infringement and unfair competition under New Jersey common law. *Deborah Heart & Lung Ctr. v. Children of the World Fdtn., Ltd.*, 99 F.Supp.2d 481, 488 (D.N.J. 2000) (citing *Barre–Nat'l, Inc. v. Barr Lab., Inc.*, 773 F.Supp. 735, 746 (D.N.J. 1991)). The plaintiff bears the burden of proof. *See A & H Sportswear*, 237 F.3d at 210–11 (citing *American Home Prods. Corp. v. Barr Labs., Inc.*, 834 F.2d 368, 371 (3d Cir.1987)). Here, where there is no dispute that plaintiff owns the mark, the issues before the Court are whether plaintiff can establish the validity of the mark and whether there is a likelihood of confusion between the marks.

### 1. *Validity of the Mark*

 In this case, it is undisputed that plaintiff owns a supplemental registration of the AMERICA'S MOST CONVENIENT BANK mark that was registered on June 19, 2001. *See* Certificate of Registration, Amended Compl. Ex. A. While registration of a mark on the Principal Register constitutes

> prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the regis-

---

return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080–81 (3d Cir. 1996). Once the moving party has carried its initial burden of establishing the absence of a

genuine issue of material fact, the non-moving party must do more than rely only "upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.1985), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985) (citation omitted). If the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505.

trant's exclusive right to use the mark in commerce on or in connection with the goods or services specified in the certificate [of registration]

15 U.S.C. § 1057(b), registration of a mark on the Supplemental Register, as in this case, does not entitle a mark to this statutory presumption, as the applicable statute provides:

> [A]pplications for and registrations on the supplemental register shall not be subject to or receive the advantages of sections 1051(b), 1052(e), 1052(f), 1057(b), 1057(c), 1062(a), 1063 to 1068, inclusive, 1072, 1115 and 1124 of this title.

15 U.S.C. § 1094; *see also Novartis Consumer Health, Inc. v. McNeil–PPC, Inc.,* No. CIV. 99–280(WHW), 1999 WL 707721, at *4 (D.N.J. Sept. 13, 1999). Unlike Principal Registration, " 'Supplemental Registration creates no substantive rights.' " *Novartis,* 1999 WL 707721, at *4 (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:37 at 19–75 (4th ed.1998)). A mark may nonetheless be valid and legally protectable, notwithstanding its exclusion from the Principal Register, "if the public recognizes it as identifying the claimant's 'goods or services and distinguishing them from those of others.' " *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir. 1986) (quoting 1 J. McCarthy, Trademarks and Unfair Competition § 15.1 at 657 (2d ed.1984)) (describing protection that may extend to marks not on the principal register). The validity of a mark that has not been registered on the Principal Register, or is registered but has not achieved incon-

testability,[5] depends on proof of secondary meaning, unless the registered mark is inherently distinctive. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994) (citing *Ford Motor Co. v. Summit Motor Prods.,* 930 F.2d 277, 291 (3d Cir.) (internal citation omitted), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991)); *see also Commerce,* 214 F.3d at 438 (quoting *Ford Motor,* 930 F.2d at 292). The distinctiveness and protectability of a mark is determined by considering the classification of the mark, which may fall into four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *J & J Snack Foods,* 220 F.Supp.2d at 375 (citing *A & H Sportswear,* 237 F.3d at 221–22).

Defendant BankAtlantic first asserts that a mark of such laudatory nature as AMERICA'S MOST CONVENIENT BANK cannot be given trademark protection under public policy, even with a showing of secondary meaning. Defendant relies on *In re Boston Beer Co.,* 1998 WL 650077, 47 U.S.P.Q.2d 1914 (Trademark Tr. & App. Bd.1998), *aff'd,* 198 F.3d 1370 (Fed.Cir.1999), in which an attempt was made to register BEST BEER IN AMERICA for beer and ale under § 2(f) of the Trademark Act. The Board refused to register the mark, stating that slogans are mere "puffery" and that "[s]uch claims of superiority should be freely available to all competitors in any given field to refer to their products or services, subject to whatever limits the law may impose on truthful advertising and unfair competition." 47 U.S.P.Q.2d 1914, 47 U.S.P.Q.2d at 1920–21.

---

**5.** A mark becomes incontestable after the owner files affidavits stating that the mark has been registered, and that it has been in continuous use for five consecutive years subsequent to registration. In addition, the owner must show that there is no proceeding contesting the owner's rights to registration, and

that there has been no adverse decision regarding the registrant's ownership or right to registration. *See Commerce,* 214 F.3d at 438 n. 4 (citing 15 U.S.C. §§ 1058, 1065; *Fisons,* 30 F.3d at 472 n. 7). Plaintiff does not contend here that the mark is incontestable.

The Federal Circuit subsequently affirmed the Board's refusal to register, stating that the phrase "is so highly laudatory and descriptive of the qualities of the product that the slogan does not and could not function as a trademark to distinguish Boston Beer's goods and serve as an indication of origin." 198 F.3d at 1373–74.

*Boston Beer* is persuasive in this case because Commerce's mark AMERICA'S MOST CONVENIENT BANK, registered only on the Supplemental Register, *see* Certificate of Registration, Amended Compl. Ex. A, also resonates in "puffery" and claims of superiority. Like the mark THE BEST BEER IN AMERICA in *Boston Beer*, plaintiff's mark in this case is a common, laudatory phrase that is merely descriptive of the services provided at its bank. As such, it is therefore likely incapable of achieving distinctiveness as a trademark which distinguishes its services from those of others and which indicates its origin. Defendant's argument that no actionable infringement would occur even if the parties operated in the same territory is therefore convincing.

The Court nevertheless considers plaintiff's argument that the validity of the mark AMERICA'S MOST CONVENIENT BANK is established through secondary meaning. "Secondary meaning exists when the mark 'is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services.'" *Commerce*, 214 F.3d at 438 (quoting *Scott Paper Co. v. Scott's*

*Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir.1978)). As discussed by the Third Circuit, a non-exclusive list of factors which may be considered in the analysis for secondary meaning includes (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion. *Commerce* 214 F.3d at 438 (citing *Ford Motor Co.*, 930 F.2d at 292).

Importantly, as stated by the Third Circuit, "[a] plaintiff must establish secondary meaning in a mark at the *time and place* that the defendant began use of the mark." *Commerce*, 214 F.3d at 438 (citing *Scott Paper*, 589 F.2d at 1231; J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:4 (4th ed.1997)) (emphasis added). "Priority depends not upon which mark succeeds in first obtaining secondary meaning but upon whether the plaintiff can prove by a preponderance of the evidence that his mark possessed secondary meaning at the time the defendant commenced use of his mark." *Scott Paper Co.*, 589 F.2d at 1231.

Before considering whether secondary meaning has been acquired in the time and place defendant commenced its mark,[6] plaintiff urges the Court to first determine that it is sufficient for plaintiff to show secondary meaning of the mark in

---

**6.** Plaintiff argues in its supplemental brief that, before turning to the issue of secondary meaning, consideration must be given to the "remote user" defense. The principle to which plaintiff refers, also known as the "Tea Rose–Rectanus" doctrine, governs territorial rights in *unregistered* trademarks. *See ACCU Personnel, Inc. v. AccuStaff, Inc.*, 846 F.Supp. 1191, 1205 (D.Del.1994) (citing *Wiener King,*

*Inc. v. Wiener King Corp.*, 407 F.Supp. 1274, 1280 (D.N.J.), *rev'd on other grounds*, 546 F.2d 421 (3d Cir.1976) (table)) (internal citation omitted). To the extent that plaintiff retains a viable common law mark, rather than a registered trademark, its argument that defendant cannot avail itself of the remote user doctrine is discussed below, *see* Part II.C, *infra*.

the four-state region due to the "sheer magnitude of BankAtlantic's business beyond Florida." Pl.'s Suppl. Br. at 13. This argument is unavailing. Although the issue here is whether secondary meaning was acquired by plaintiff at the time BankAtlantic commenced use of its mark on April 1, 2002, the bulk of the evidence raised by plaintiff relates to the financial success of BankAtlantic during and through the year 2002, and afterwards in 2003. For example, plaintiff claims that as of December 1, 2002, BankAtlantic derived over $1.1 billion of its total account balance from customers residing outside of Florida, Chart, Miller Decl. Ex. 11, with deposit accounts from customers in the four-state region valued at more than $80 million, broken down as follows: New Jersey, $34.4 million; New York, $35.7 million; Pennsylvania, $11.1 million; and Delaware, $329,189.[7] Plaintiff additionally provides that defendant's mark can be found on cruise ships, United States military installations and Indian reservations, citing to a chart of 2003 ATM locations, see 2003 ATM Locations Chart, Miller Decl. Ex. 12.

Yet this evidence does not indicate that defendant's use of its FLORIDA'S MOST CONVENIENT BANK mark is associated with any advertising efforts made in Commerce's four-state region. There is no evidence propounded by plaintiff that defendant directed advertising of its mark at, or actively sought customers or conducted business with its mark in, the states of New York, New Jersey, Pennsylvania, or Delaware. The volume of customers BankAtlantic had acquired in these mid-Atlantic states by April 1, 2002, cannot be a reflection of customers gained through the use of its mark, which had not commenced use at that time. Plaintiff's theory that the territory at issue must be held to extend to the four state region based on the existence of defendant's business (prior to commencing use of its mark) is contrary to the exact situation requiring a secondary meaning analysis. In other words, a secondary meaning analysis appropriately determines whether a junior user's use infringes on the use of a mark by a senior user. To base such a determination on the existence of a defendant's business, rather than use of a mark, lacks reason. Plaintiff's argument therefore fails,[8] and the Court now examines whether plaintiff had acquired secondary meaning in defendant's territorial area of Florida.

[7]. The evidence relevant to the April 1, 2002 date, rather, indicates that the total number of accounts in each state before that effective date numbered 209,956 accounts, with only 1,965 in New York, 808 in New Jersey, 329 in Pennsylvania, and 64 in Delaware. *Id. see* BA2399, Miller Decl. Ex. 18. The bulk of BankAtlantic's accounts were opened in Florida, however, numbering 202,218, amounting to over 96% of BankAtlantic's accounts. *Id.* Prior to April 1, 2002, the loans in New York numbered 260, with 120 in New Jersey, 72 in Pennsylvania, and 5 in Delaware, out of a total of 20,674 loans. Chart, Miller Decl. Ex. 25. In addition, the total balance on these loans amounted to $54 million, out of a total of $1.85 billion. *Id.* The loans in the northeast states constituted less than 3% of BankAtlantic's loan portfolio.

[8]. While plaintiff is correct that online banking has increased the number of services similar to those available at the brick-and-mortar branches, the case it cites, *Laurel Capital Group, Inc. v. BT Fin. Corp.*, 45 F.Supp.2d 469, 492 (W.D.Pa.1999), does not support plaintiff's argument. In that case, while defendant had unquestionably gained a reputation beyond its market area by virtue of advertising and activities, some of which were conducted on the web, the court held that the defendant bank had "never been the subject of extensive national or statewide advertising," particularly in the sense that restaurants or hotels are. *Id.* Accordingly, the court rejected defendant's argument that it penetrated the market of plaintiff, even with the strides gained through online banking.

a. *Extent of Sales and Advertising and Length of Use*

Plaintiff argues that it has promoted the mark since it was first adopted in 1996, prominently featuring the signature brand in most, if not all, advertisements and promotions in TV, radio, billboard, and newspaper advertising media. DiFlorio Aff. in Support of Prelim. Inj., ¶¶ 7–20; Advertising and Promotion Summary, Siano Aff. Ex. A. Plaintiff has also used the mark in connection with its internet promotional efforts for Commerceonline.com. DiFlorio Aff., ¶ 21.

Commerce expended approximately $14.8 million in advertising and promotional activity in connection with the mark from 1997 through 2001, spending approximately $4.7 million in 2001 alone. *See* DiFlorio Aff. ¶ 15; Commerce 2001 Annual Report, DiFlorio Aff. Ex. A. Charts created by Commerce's media consultants indicate that almost 2.5 billion gross impressions of plaintiff's advertising have been exposed to the public. *See* Advertising and Promotion Summary, Siano Aff. Ex. A. In addition, from 2000 to 2002, Commerce's total expenditure for Yellow Pages advertisements featuring the mark was $855,242, while total distribution of the yellow pages was 34,389,742. *See* DiFlorio Aff. ¶ 17. In addition, the mark has been used on "point of sale" materials including brochures, key fobs, and envelopes, and is prominently featured on all Commerce-issued checks, which numbered 35 million in 2001. *Id.* ¶¶ 18–19.

With respect to Florida advertisements, Commerce has run ads in *The New York Times*, claiming that it has achieved 99,912 gross impressions in Florida in 2001, and almost 650,000 gross impressions in Florida in 2002, *see* DiFlorio Suppl. Aff. ¶ 10. Mr. Siano's affidavit provides that "gross impressions" are defined as the sum of all exposures to an advertisement by either people or homes, Siano Aff. ¶ 5.

As defendant contends, if the total number of "impressions" for the mark came to 2,486,000,000, and the "Florida impressions" of the mark is 749,340, then the percentage of impressions comes out to about three hundredths of one percent of the total number of impressions (0.03 percent). This necessarily means that a very small percentage of the advertisements actually reach consumers in Florida, compared to the entirety of advertisements they purchase. Moreover, Commerce's advertising in *The New York Times* did not target Florida, but instead it reached Florida through the mechanism of that newspaper's national distribution.

The cumulation of the above expenditures related to advertising and sales using the mark at issue demonstrates that plaintiff has made extensive efforts for over six years to market and advertise its product with the associated mark under the first two factors listed above. However, while Commerce has made substantial efforts to advertise in the mid-Atlantic region, its advertising efforts reach a small percentage of customers in Florida. There is no directed advertising effort made to customers located in Florida, nor is there any plan to advertise to states other than New York, New Jersey, Delaware, and Pennsylvania, and perhaps Connecticut and other states located north of the mid-Atlantic region in the future. Even though plaintiff conducts advertising through the internet, it has plainly indicated that it directs its advertising to the midAtlantic region. This does not support plaintiff's position that a secondary meaning of AMERICA'S MOST CONVENIENT MARK exists in Florida.

b. *Copying of Mark*

Plaintiff argues that BankAtlantic intentionally copied Commerce's mark in a way

that copies the manner in which the mark is used by Commerce. Comparing a print advertisement of Commerce for "Seven Day Branch Banking," DiFlorio Aff. Ex. B, with defendant's print advertisement for "7 Day Branch Banking," *id.* Ex. H, indicates a similarly styled advertisement, in which the heading substantially covers almost one-half of the page, with the banks' names at the bottom of the page. While "Bank" is immediately under the latter half of the word "Commerce," "Bank" is slightly above but next to "Atlantic" in the other advertisement. The AMERICA'S MOST CONVENIENT BANK mark is not prominently displayed in Commerce's advertisement but rather is in very small font, while the FLORIDA'S MOST CONVENIENT BANK mark is very prominently displayed in font size similar to the BankAtlantic name.

While it appears that defendant's banking hours are similar to those of plaintiff, *see id.* Ex. B, at 1–5; *id.* Ex. H, at 1–4, they are not identical in all respects. In addition, while these services may to some extent seem similar, plaintiff concedes it does not claim exclusive rights to provision of services, such as "seven-day banking" or "totally free checking." Furthermore, BankAtlantic recruited former Commerce employees to work on FLORIDA'S MOST CONVENIENT BANK and WOW! initiatives, *see* DiFlorio Suppl. Aff. ¶¶ 2–6; Levan Depo. at 25–26, Miller Decl. Ex. 3.

From the above advertisements and actions by BankAtlantic to recruit Commerce's former employees, a reasonable fact finder could infer that defendant intended to copy the type of services provided by plaintiff, and that it copied the use of a portion of plaintiff's mark in defendant's Florida advertising.

### c. *Customer Surveys and Testimony*

Defendant states in its supplemental brief that Commerce has failed to submit any consumer surveys, which it indicated it would provide in its reply brief in support of its preliminary injunction motion, *see* Pl.'s Reply Br., 12/4/02, at 15. Because the deadline for serving affirmative expert reports was May 16, 2003, it can be assumed that no expert report regarding consumer surveys is forthcoming. Thus, there are no customer surveys or testimony regarding the secondary meaning of the AMERICA'S MOST CONVENIENT BANK mark, and this does not support a finding that the mark has acquired a secondary meaning in Florida.

### d. *Use of Mark in Trade Journals*

Plaintiff submits that independent media has provided news coverage referencing the mark, including articles in *U.S. Banker, The Wall Street Journal, The Philadelphia Inquirer, Microbanker Online. See* DiFlorio Aff. Ex. G. These articles refer to the fact that plaintiff "even bills itself as 'America's Most Convenient Bank,'" that Commerce's founder Vernon Hill "billed Commerce as 'America's Most Convenient Bank,' in an effort to steal dissatisfied customers from rivals," that Commerce "relentlessly instills in staffers [its] 'customer-focused culture' as 'America's most convenient bank,'" and that Commerce "takes its motto as 'America's Most Convenient Bank' seriously." *Id.*

These references to plaintiff and its accompanying slogan in articles published in print and online news media support plaintiff's position that the public associates the AMERICA'S MOST CONVENIENT BANK slogan with its banking services. However, the fact that the newspapers are prevalent in the mid-Atlantic region more so than in Florida, and that several are specialized trade publications not read by the general public, is not indicative that a

secondary meaning of the mark has been acquired in Florida.

### e. *Size of Company and Numbers of Sales and Customers*

As mentioned above, Commerce and its subsidiaries have over one million customers. DiFlorio Aff. ¶ 2. In 2001, there were over $10 billion in customer receipts, over $11 billion in assets, over $4.5 billion in loans and a net income of $103 million. *See id.* ¶¶ 2–3; 2001 Annual Report, DiFlorio Aff. Ex. A, at 1. By the end of 2001, Commerce's banking subsidiaries were operating 184 bank branches in the mid-Atlantic region, including New Jersey, Pennsylvania, New York, and Delaware, with 41 branches scheduled to open in 2002, none in the Florida region as far as the evidence indicates. *See* DiFlorio Aff. ¶ 3; 2001 Annual Report, DiFlorio Aff. Ex. A, at 5.

Plaintiff's customer base in Florida is extremely small. Commerce's 3500 customers in Florida comprise a tiny fraction of Commerce's over one million customers, and a minuscule portion of the 16,000,000 total potential customers in Florida. *See* DiFlorio Aff. ¶ 3. Plaintiff's "share" of the total Florida banking market is essentially non-existent.

Defendant contends in its reply brief that plaintiff has not established secondary meaning in Florida, stating that Commerce has branch banks only in New Jersey and surrounding areas, and that Commerce does not advertise in Florida, despite plaintiff's assertion that it has advertised the mark in Florida in a publication known as Commerce Connection. Commerce Connection Spring 1998, DiFlorio Aff. Ex. D. In that publication, Commerce states that its "commercials

have been running on all of the region's major local network affiliates ..." and that its spots have been airing on news programs "broadcast locally on WCAU, KYW and WPVI," *id.*, which are Philadelphia-based network affiliates. Furthermore, it goes on to state that

> The ads are one more powerful reminder that Commerce clearly is the region's most dynamic bank and is committed to serving the people and communities of New Jersey, eastern Pennsylvania and northern Delaware for years to come.

*Id.*

In Commerce's 2001 Annual Report, DiFlorio Aff. Ex. A, the existing and projected Commerce branches are mapped out, in the locations of New York City, Philadelphia, surrounding Pennsylvania counties of Bucks, Montgomery, Chester, and Delaware.[9] The map also indicates that Commerce has branches in and around Wilmington, Delaware. *Id.* It states that it expects to accelerate its expansion to capitalize on new business opportunities that exist "throughout the four-state Commerce footprint." *Id.* at 10. Further, an article regarding Commerce's growth indicates the company's plans to expand northward, to Boston, DiFlorio Aff. Ex. G, while Commerce Executive Vice President DiFlorio indicated in his deposition that the company planned to expand to Connecticut. *See* DiFlorio Depo., Hall Decl. Ex. 1, at 99. Accordingly, Commerce has made use of the term in connection with its network of bank branches that extends only as far south as Delaware, which come nowhere near Florida. Moreover, plaintiff has indicated its intention to expand only northward, not southward.

---

**9.** The Report lists offices in the following regions: New York, Southern New Jersey, Pennsylvania, Central New Jersey, Northern New Jersey, the New Jersey Shore, and Delaware. *Id.* at 14–21.

Moreover, defendant takes issue with Commerce's assertion that its insurance subsidiary Commerce National Insurance Services, Inc. ("CNIS") has over 125,000 customers and "directly or indirectly" sells insurance in over 30 states including Florida. DiFlorio Suppl. Aff. ¶¶ 5 and 9. While Commerce's investment banking subsidiary, Commerce Capital Markets, Inc. does business throughout the country, *id.* ¶ 4, there is no evidence that this banking subsidiary uses the mark in connection with its services of public finance, asset management and equity capital markets, *id.* As with Commerce Capital Markets, there is no evidence that Commerce National Insurance Services uses the mark in connection with its services of selling insurance. As defendant correctly points out, there is no evidence in the record that any CNIS customers in Florida actually see and recognize plaintiff's mark. Furthermore, defendant argues, the establishment of trademark rights in connection with insurance does not create trademark rights in banking, citing *Commerce Nat'l Ins.*, 214 F.3d at 442.

In addition, Commerce provides that over 30% of its customers' households use Commerce Online, as over 165,000 customers used Commerce's online banking services in 2001, and an increased number used these online services in 2002. Commerce Annual Report 2001, DiFlorio Aff. Ex. A, at 3, 24; 2002 Annual Report, DiFlorio Suppl. Aff. Ex. A, at 20.

This evidence demonstrates that Commerce conducts substantial business in the mid-Atlantic region comprising the four states of New York, New Jersey, Pennsylvania, and Delaware, and uses its mark in connection with its services in that geographic region. There is no evidence, however, that its subsidiary companies conducting business on a national level use the mark in connection with their services.

Commerce also does not have any present plans to open branches in Florida, as the Annual Report makes mention of new offices opening in New York, Commerce VP DiFlorio indicates that offices may be opening in Connecticut, and CEO Vernon Hill states that branches are planned for Boston. Furthermore, Commerce's customer base of 3,500 in Florida represents a minuscule portion of the over one million customers it has overall. Because secondary meaning must exist among a "substantial segment" or "appreciable number" of relevant customers, *see* McCarthy on Trademarks and Unfair Competition § 15:45, at 15–68 (4th ed.2002), these factors of the number of branch offices in the mid-Atlantic region, versus its lack of presence in Florida, and the small number of customers residing in Florida versus its overall customer base, does not support a conclusion that a secondary meaning of the mark exists in Florida.

### f. Actual Confusion

There is no evidence that any customers of Commerce have been actually confused by defendant's use of the mark. Although Commerce had first moved for preliminary injunction on November 6, 2002, it stated that with respect to evidence of actual confusion, a "relatively short time [ ] has passed since [BankAtlantic] began to use its mark. . . ." Commerce Prelim. Inj. Br. at 13. Despite discovery having been completed by this point, over a year since BankAtlantic began using FLORIDA'S MOST CONVENIENT BANK mark, plaintiff is still unable to adduce any evidence of actual consumer confusion between the two marks.

### g. Conclusion

In this case, no reasonable juror could find that the AMERICA'S MOST CONVENIENT BANK mark has acquired sec-

ondary meaning in Florida. The record indicates that Commerce has extensively advertised its services in the media and through using online marketing to the mid-Atlantic region, encompassing New York, New Jersey, Pennsylvania, and Delaware. There is no evidence that plaintiff made meaningful or purposeful advertising efforts to the Florida region, where defendant began using the FLORIDA'S MOST CONVENIENT BANK mark and primarily conducts business and promotes its services in connection with the mark. Commerce has approximately 3,500 customers located in Florida, yet this is not a substantial and appreciable number considering the one million customers it currently has, and even among Commerce's own Florida customers, none have indicated confusion or even raised a question about defendant's marks, so far as the evidence shows. The record shows that plaintiff intends to expand northward to Boston and parts of Connecticut, but nowhere has it indicated any intention of expanding into Florida.

Accordingly, based on the above, a reasonable juror could not find that a secondary meaning of the AMERICA'S MOST CONVENIENT BANK mark has been acquired in Florida. Because plaintiff cannot prove that its mark had acquired secondary meaning at the time and place where defendant began using its mark, the mark is not valid. Since plaintiff fails to establish validity of the mark, not registered on the Principal Register, its claim for a Lanham Act violation fails. Defendant's motion for summary judgment will be granted.

2. *Likelihood of Confusion*

 Even if plaintiff were able to establish that a secondary meaning of the mark was acquired in Florida, it nevertheless fails to establish that defendant's use of its mark creates a likelihood of confusion, under the third prong required for a Lanham Act violation. Defendant asserts that there is no likelihood of confusion because actual confusion has been absent for more than a year, and because the high degree of care in selecting banking services militates against confusing similarity. "A likelihood of confusion exists when 'consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *A & H Sportswear*, 237 F.3d at 211 (quoting *Dranoff–Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992)). When the goods involved in a trademark infringement action do not compete with each other, the Third Circuit has adopted a nonexhaustive list of factors (the *"Lapp"* factors) to determine whether there is a likelihood of confusion between marks:

(1) the degree of similarity between the owner's marks and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*A & H Sportswear,* 237 F.3d at 211. The Third Circuit held that these *Lapp* factors are to be used for both competing and noncompeting goods. *Id.* at 213. *See also Checkpoint Systems, Inc. v. Check Point Software,* 269 F.3d 270 (3d Cir.2001) (affirming district court non-jury opinion, which gave detailed attention to the *Lapp* factors).

### a. *Degree of Similarity*

In this case, plaintiff contends that the marks at issue are similar, because the marks create the "same overall impression." *Fisons,* 30 F.3d at 477. Both of the marks include the phrase MOST CONVENIENT BANK. The only difference here is the word AMERICA'S versus FLORIDA'S, which are added to the beginning of the phrase. Plaintiff further maintains that the marks are used in connection with identical and competitive banking services, and that they are very similar in appearance.

Comparing the two logos incorporating the phrase MOST CONVENIENT BANK, the marks are substantially similar. As discussed above, a print advertisement of Commerce for "Seven–Day Branch Banking," DiFlorio Aff. Ex. B, and defendant's print advertisement for "7 Day Branch Banking," *id.* Ex. H, indicates a similarly styled advertisement, in which the heading substantially covers almost one-half of the page, with the banks' names at the bottom of the page. The AMERICA'S MOST CONVENIENT BANK mark is not prominently displayed in Commerce's advertisement but rather is in very small font, while the FLORIDA'S MOST CONVENIENT BANK mark is very prominently displayed in font size similar to the BankAtlantic name. The mark in these two advertisements does not share the same font or size. In addition, what is apparent on Commerce's advertisement is the color red, as that is the only color that offsets the black writing and white space. No color copies of BankAtlantic's mark have been submitted.

Plaintiff argues that because the remaining portion "MOST CONVENIENT BANK" is the dominant portion, there is a question of fact regarding likelihood of confusion, citing *Country Floors, Inc. v. Gepner & Ford,* 930 F.2d 1056 (3d Cir. 1991) (where dominant portion of two marks, *Country Floors* and *Country Tiles,* are similar, genuine factual issue is raised as to likelihood of confusion, defeating summary judgment). *Country Floors* involved two logos, "Country Floors" and "Country Tiles," which used the same type font and are both set on ceramic tile surrounded by a border design. The Third Circuit stated that this similarity alone raised a genuine factual dispute on the likelihood of confusion. Based on this and the fact that other factual issues regarding relevant markets, effect of prior use on registered marks, and availability of laches, the Third Circuit held that summary judgment should have been denied.

This situation is distinct primarily because the parties' respective names, "Commerce" and "BankAtlantic," accompany their respective marks, unlike *Country Floors,* in which the companies themselves shared a common word. As the Third Circuit explained in *A & H Sportswear,* 237 F.3d at 218, the terms "floors" and "tiles" were discounted as generic in the application to the PTO, and therefore "the use of the word 'Country' by the [defendant] is a material, although not necessarily a controlling, consideration on the [plaintiff's] claim that 'Country Tiles' logo directly infringed on the [plaintiff's] feder-

al trademark." *Id.* (quoting *Country Floors,* 930 F.2d at 1065).

Here, the mark is registered on only the Supplemental Register, and the PTO made a determination to discount only the word "Bank," *see* Certificate of Registration, Amended Compl. Ex. A. Where the remainder of the mark consists of more than solely a word commonly shared by the respective companies as in *Country Floors,* and where the mark is each differentiated by a word indicating region, this does not present a material consideration as in *Country Floors.* Moreover, the Third Circuit has "previously acknowledged the importance of housemarks in comparing the 'overall impression' of two marks." *A & H Sportswear,* 237 F.3d at 218 (quoting *A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 191, 195 (3d Cir.1999)) (noting that the district court recognized that "affixing a well-known housemark like that of Victoria's Secret can help diminish the likelihood of confusion" in discussing the marks The Miracle Bra and Miraclesuit). Here, the housemarks "Commerce" and "BankAtlantic" allow one to visibly differentiate between the two marks, as Commerce's use of the mark is always in conjunction with the COMMERCE BANK mark and/or Commerce's "C" logo, *see* Hall Decl. Ex. 1, DiFlorio Depo. at 107–08, and BankAtlantic's use of its mark is always in conjunction with its own house mark BANKATLANTIC. *See, e.g.,* DiFlorio Suppl. Aff. Ex. A. There is further no similarity in font or size of the lettering of these words to the extent found in *Country Floors,* where the lettering shared the same font and size, and were both on a square tile, surrounded by a border design. Thus, because the marks in this case are always in combination with a housemark which distinguishes them, comparison of the FLORIDA'S MOST CONVENIENT BANK mark, following the "BankAtlantic" name, with the AMERICA'S MOST CONVENIENT BANK mark, following the "Commerce" name, leads to the conclusion that the marks are distinct and do not raise a genuine factual dispute as to the likelihood of confusion in this case.

### b. *Strength of Mark*

Under the second prong, plaintiff alleges that its mark has considerable commercial strength due to six years of Commerce's continuous and exclusive use of the mark and expansive growth in revenues in connection with the mark.

Defendant argues that plaintiff's mark is not strong, as third party usage of the MOST CONVENIENT BANK mark has continued to proliferate in other regions. For example, TCF Bank touts itself as "Wisconsin's most convenient bank," Wepner Decl. Ex. H. Defendant's citation to the Commerce Bank & Trust in North Topeka (no relation to plaintiff) also shows that the advertisement of the bank has the heading "Most Convenient Banking North of the River," and includes a sentence, "This location furthers our commitment to being North Topeka's most convenient bank." Wepner Decl. Ex. J. Cape Cod Bank & Trust also describes itself as "the Cape's most convenient bank" on its webpage discussing the company's services. Hall Decl. Ex. 3. In addition, Tri Counties Bank in Chico, California, provided a press release entitled "Chico's Most Convenient Bank Opens Another Chico Branch." *Id.* Ex. 4.

Although these banks are referred to as the "most convenient bank" of their respective regions, the phrase MOST CONVENIENT BANK is not incorporated into their logos or marks, as in this case. However, this evidence demonstrates that, to the extent plaintiff asserts that its mark receives national recognition, such adver-

tising by other banks in various states throughout the country, coupled with plaintiff's near absence of national advertising, also reflects the understanding that plaintiff's mark is not nationally known, and that it therefore is not strong. Thus, this does not support a finding of likelihood of confusion.

### c. *Degree of Care*

Under the third prong, plaintiff asserts that an ordinary customer viewing the two marks might reasonably assume that defendant's services are sponsored or otherwise emanate from Commerce. Although plaintiff appears to argue that, due to defendant's use of its ATM network to promote itself on a world-wide basis, customers viewing the mark will be confused when conducting business at a bricks and mortar branch, and despite the fact that it generates millions in deposits and loans from Florida-based customers, Chart, Second Suppl. DiFlorio Aff. Ex. F, there is no evidence that the ATMs of plaintiff and those of defendant even exist in or around the same locations. Because plaintiff's ATMs and bank branches are located in the mid-Atlantic region, and those of defendant exist in the Florida region, there would be no opportunity for an ordinary customer viewing the FLORIDA'S MOST CONVENIENT BANK mark to be confused about the sponsorship or association of such mark, and therefore no ordinary customer could reasonably assume that BankAtlantic's network of banks emanates from that of Commerce.

As defendant correctly maintains, the import of having to choose a banking institution translates into affording greater care in selecting banking services. As submitted by defendant's expert, Ralph Haberfeld in his May 16, 2003 report, customers who use the Internet are likely more educated, and therefore more careful in selecting their banking services:

> In my opinion, individuals who avail themselves of Internet banking are more educated and more affluent than banking customers as a whole. First, in order to participate in Internet banking, it is important to have high-speed Internet access, which is somewhat expensive and which is not readily available in all areas. In addition, people, who partake of Internet banking tend to be comfortable if not enamored with technology. As a result, in my opinion, those who use Internet banking are more sophisticated than the general population of banking customers.

Haberfeld Report, ¶ 28, Hall Decl. Ex. 5.

The fact that people are especially selective in choosing their banking and financial services, and thus take great care in choosing such services, as well as the fact that customers over the Internet are more likely to be able to differentiate between the two companies, this factor fails to support a likelihood of confusion in this case.

### d. *Actual Confusion*

As mentioned above, plaintiff in its preliminary injunction had argued that without the benefit of discovery, it had not discovered any evidence of actual confusion. Yet, with the supplemental submissions, plaintiff again fails to adduce evidence under this factor. Rather, it argues that this factor "is entitled to little weight." Pl.'s Suppl. Opp. Br. at 25. This factor of actual confusion therefore does not support that a likelihood of confusion exists.

### e. *Intent of Defendant*

As the Third Circuit has stated, "court have recognized that evidence of 'intentional, willful and admitted adoption of a mark closely similar to the existing marks'

weighs strongly in favor of finding the likelihood of confusion." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d 270, 286 (3d Cir.2001) (citing *Nat'l Football League Props., Inc. v. New Jersey Giants, Inc.,* 637 F.Supp. 507, 518 (D.N.J.1986)). The evidence described above indicates that defendant copied plaintiff's mark, adopted certain of Commerce's core business practices (7 Days Branch Banking and Totally Free Checking), adopted the use of the WOW! mark and recruited key marketing personnel from plaintiff company. For example, as mentioned above, BankAtlantic recruited former Commerce employees to work on FLORIDA'S MOST CONVENIENT BANK and WOW! initiatives, *see* DiFlorio Suppl. Aff. ¶¶ 2–6; Levan Depo. at 25–26, Miller Decl. Ex. 3. This supports the reasonable inference that defendant intentionally copied plaintiff's mark.

Defendant counters that while it acknowledges that it knew of Commerce's use of the mark when it adopted FLORIDA'S MOST CONVENIENT BANK, there is no evidence that defendant had any intent to benefit from any goodwill established by plaintiff, nor was there any evidence that in April 2002 defendant was attempting to prevent plaintiff from entering the Florida market. Rather, defendant submits that the reason that it adopted the Florida mark was that the slogan described the convenience of its services, and because defendant was confident no confusion was possible since Commerce had no plan to move to Florida at any time and due to the geographical separation between the parties' respective territories. *See* Levan Depo., at 18, 19, 82, Miller Decl. Ex. 3.

The evidence provides the reasonable inference that defendant intended to adopt slogans and programs identical to those used by plaintiff within its banking services. This inference is, however, weakened by the fact that defendant uses the laudatory phrase "Most Convenient Bank" limited by the modifier "Florida's." This factor falls in plaintiff's favor, albeit weakly.

### f. *Channels of Trade and Advertising*

Under the seventh factor, whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media, plaintiff asserts that the parties advertised their services through the same channels, namely, newspapers, radio and the Internet. *See* Levan Aff. ¶ 4. There is no evidence, however, that these marks have ever appeared in the same publication or in the same broadcasting market through television or radio. This factor favors neither party.

### g. *Targets of Sales Efforts*

As mentioned above, the targeted consumers of both parties overlap to a very slight extent, in that defendant derived more than 20% of its revenues from customers located outside Florida, and had customer accounts valued at more than $80 million in New Jersey, Pennsylvania, New York and Delaware by the end of 2002. *See* Chart, Miller Decl. Ex. 11. Defendant, however, primarily maintains its customer base in Florida, which accounts for 95% of all of its customers. *See id.*

The targeted consumer populations of plaintiff's and defendant's advertising efforts are considerably and geographically different. Although a portion of plaintiff's customers may reside in the region in which defendant's network operates, and vice versa, there is no location in which both plaintiff's and defendant's bank branches or ATMs can be found within 1,000 miles of each other. Online advertising is accessible by customers of both

plaintiff and defendant, but this would not necessarily result in an intermixing of plaintiff's and defendant's customers or of the targets of their respective sales and advertising efforts because, as discussed earlier, more care is involved in the accessing of financial services over the internet. In other words, there is no overlap of provision of services in the bricks and mortar context, and to the extent that there may be overlap in the online context, the high degree of care involved in selecting financial and banking services may negate such an effect. This factor favors defendant's position.

### h. *Conclusion*

As discussed above, defendant's mark appended by its housemark is not similar to that of plaintiff's mark, and the degree of care a customer would use in selecting a banking institution is fairly high. Although plaintiff has used the mark for over six years, there is no evidence of any actual confusion. There is evidence regarding defendant's intent to copy the different types of services plaintiff offers, as well as recruiting its former employees. However, while the advertising efforts of the two companies share the same general channels of trade and media, their marks have never appeared in the same publication or the same radio or television market, and the targets of their sales efforts are substantially, if not completely, different, as plaintiff advertises to the mid-Atlantic region, while defendant advertises to the Florida region. That there exists a major geographic distance between their primary areas of business, and that there are no locations in which the bank branches and ATMs of both plaintiff and defendant are located, support the conclusion that the targets of the parties' sales and advertising efforts are dissimilar. Consideration

of the above factors thus overwhelmingly favors defendant.[10] Plaintiff therefore cannot establish the third prong that there is a likelihood of confusion between the marks.

Even if plaintiff were able to establish secondary meaning of its mark, no reasonable jury could conclude that a likelihood of confusion between the two marks exist. Defendant's summary judgment motion will therefore be granted as to plaintiff's claims for Lanham Act violations and common law claims for trademark infringement and unfair competition in Counts I, II, III and IV.

### B. *Remote User Defense*

 Plaintiff's arguments regarding the remote user defense come within the context of its claim for common law trademark infringement. Under the common law, trademark rights are acquired through adoption and actual use of the mark in an area. *See Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1396 n. 27 (3d Cir.1985) (distinguishing between scope of rights flowing from federal registration and common law rights in a trademark), *cert. denied,* 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985); *Ford Motor Co.,* 930 F.2d at 292 (citations omitted). Determining ownership requires ascertaining which of two competing users is the senior and junior user. *Laurel Capital,* 45 F.Supp.2d at 481 (citing *ACCU Personnel,* 846 F.Supp. at 1204 n. 12). Where two users operate in geographically remote markets, prior appropriation is legally insignificant. *Laurel Capital,* 45 F.Supp.2d at 481. Rather, the "remote user" principle, which has come to be known as the *Tea Rose–Rectanus* doctrine, governs the issue of territorial rights in unregistered trademarks. Even if Com-

---

**10.** The parties did not address the last two factors of the likelihood of confusion analysis.

merce's common law claims remained viable, plaintiff's argument that BankAtlantic cannot use this "remote user" defense, or *Tea Rose–Rectanus* doctrine, to its benefit would fail.

 The United States Supreme Court in *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916), announced the principles governing the territorial rights of trademark holders under the common law. *See also ACCU Personnel*, 846 F.Supp. at 1204. Under the *Tea Rose–Rectanus* doctrine, which governs territorial rights in unregistered trademarks, *see ACCU Personnel*, 846 F.Supp. at 1213 (citing *Wiener King*, 407 F.Supp. at 1280 (internal citation omitted)), "where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote, the one from the other, the question of prior appropriation is legally insignificant, unless ... it appear[s] that the second adopter has selected the mark with some design inimical to the interests of the first user[.]" *Hanover Star*, 240 U.S. at 415, 36 S.Ct. 357. "To obtain protection under the *Tea Rose–Rectanus* doctrine, defendant must show that it is both geographically remote and have adopted and used the trademark in good faith." *See ACCU Personnel*, 846 F.Supp. at 1213 ("[I]f the junior user cannot show that it is both geographically remote and in good faith, that user is not entitled to the benefit of the [*Tea Rose–Rectanus*] doctrine. In other words the senior user is deemed to own the trademark."). Thus, 'the senior user of a common law mark may not be able to obtain relief against the junior user in an area where [the senior user] has no established trade, and hence no reputation and no good will.' *Natural Footwear*, 760 F.2d at 1394.

### 1. Geographic Remoteness

 Although plaintiff argues solely that defendant's use is in bad faith and that such bad faith is fatal to "remote user" defense, citing *Adray v. Adry–Mart, Inc.*, 68 F.3d 362, 365 (9th Cir.1995) ("Bad faith adoption of a mark is a generally recognized exception to the requirement that secondary meaning be shown in a disputed area."), *amended & superseded by* 76 F.3d 984 (9th Cir.1995), the Third Circuit has highlighted four factors in determining whether a mark's market penetration in a given area is sufficient to warrant trademark protection in this twopronged inquiry. *See Natural Footwear*, 760 F.2d at 1398–99; *see also ACCU Personnel*, 846 F.Supp. at 1205 (citing *Natural Footwear*, 760 F.2d at 1398–99). These four factors are: (1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area. *Natural Footwear*, 760 F.2d at 1398–99. Courts should evaluate market penetration at the time the junior user commenced adoption and use of its mark, which in this case occurred on or around April 1, 2002. For purposes of the market penetration test, the senior user, here Commerce, "bears the burden of proving the reputation of its trademark extends into a particular area." *ACCU Personnel*, 846 F.Supp. at 1206 n. 15 (citing *Natural Footwear*, 760 F.2d at 1403; *Sweetarts v. Sunline, Inc.*, 436 F.2d 705, 707 (8th Cir.1971)). Here, the area to which Commerce seeks extension of its protection is the Florida region.

Plaintiff is unable to prove that the reputation of its mark extends into Florida. First, in examining the volume of sales of the trademarked product, that is, the banking services associated with the mark,

there are no Commerce bank branches or ATMs in the state of Florida. DiFlorio Depo., Hall Decl. Ex. 1, at 104, and thus no services through bank branches take place. To the extent that plaintiff claims that its capital markets and insurance subsidiaries under Commerce Capital Markets, Inc. do business throughout the United States, neither of the subsidiaries has any locations in Florida. *Id.* at 185.

In addition, the growth trends indicate that Commerce's deposits and loans in the Florida area are increasing. For example, the total Florida deposits in 2001 were $23.34 million, and increased to $48.17 million in 2002. Chart, DiFlorio Suppl. Aff. Ex. F. Total Florida loans in 2001 amounted to $18.83 million, and increased to $29.92 million in 2002. *Id.* However, the evidence provides that, in terms of business expansion, plaintiff's current business plan is to expand north, including bank branches in Connecticut, *see* DiFlorio Depo., Hall Decl. Ex. 1, at 99. There are currently no plans to expand plaintiff's business to the state of Florida.[11]

Commerce had a total of approximately 3,500 customers in Florida by December 2002. DiFlorio Aff. ¶¶ 3–5. The potential number of customers in the Florida region is 16,000,000, and the 3,500 number is less than two-hundredths of one percent, a miniscule fraction of the available customer base as a whole. This 3,500 number also comprises a small fraction of the 1,000,000 customers which Commerce claims to have. DiFlorio Aff. ¶ 2.

Furthermore, as discussed above, Commerce does not advertise its services in the Florida region. Dennis DiFlorio, Executive Vice President and Chief Retail Officer of Commerce Bank, testified in his deposition the following:

Q: Is there a budget, advertising budget allocation for New Jersey?

A: Yeah, sure.

Q: Is there a budget allocation for advertising in New York?

A: Yes.

Q: Is there an advertising budget allocation for Delaware?

A: Yes.

Q: Is there a budget allocation for advertising for Pennsylvania?

A: Yes.

Q: Is there an advertising budget allocation for Florida?

A: No, not that I am aware of specifically for—now, when you mention those names, are you talking about the states or are you referring to banks? Because there is not an allocation budget—there is not an allocation budget by state lines. There is an allocation budget by banks. When you referred to those states, I was assuming you were referring to Commerce Bank/Delaware, Commerce Bank, N.A., Commerce Bank/Pennsylvania, not the state of Pennsylvania. So yes, there are budgets, and the budgets are by company.

Q: Okay, but Commerce doesn't have any bank branches in Florida; is that correct?

A: Correct.

DiFlorio Depo., Hall Decl. Ex. 1, at 103–04. Mr. DiFlorio goes on to state that although there are no bank branches in Florida, there are Commerce customers who live in Florida. In addition, Commerce does not run television ads with its mark in Florida or anywhere outside the four-state region. *Id.* at 114. There is no evidence that Commerce's subsidiaries ac-

---

**11.** Defendant states that plaintiff is unlikely to expand into the Florida region because there is already a Southern Commerce Bank in Tampa, Florida, *see* Hall Decl. Ex. 6, which is in defendant's existing territory. *See* Jarett Levan Decl. ¶ 2.

tively advertise within the Florida market, either through television, newspaper, or other print material.

Plaintiff counters with evidence that ads in *The New York Times* achieved over 650,000 "gross impressions" in Florida. As discussed earlier, Commerce claims that it has achieved almost 650,000 gross impressions in Florida in 2002, *see* DiFlorio Suppl. Aff. ¶ 10. As defendant points out, this amounts to approximately three-hundredths of one percent of Commerce's total impressions over a two-year period and less than five-hundredths of one "impression" per Florida resident. These "gross impressions," at best, indicate that incidental advertising to Florida residents may occur through the advertising of national media, not through Commerce actively advertising to that region.

Thus, while Commerce readily advertises to the four-state region, and claims to be AMERICA'S MOST CONVENIENT BANK for the mid-Atlantic area, there is no evidence that it ever advertised or attempted to advertise specifically in Florida. To the extent that its advertisements appeared in *The New York Times*, which may have been received by Florida residents, this still does not demonstrate that Commerce attempted to directly penetrate the Florida market, any more than the market of any of the dozens of other states where *The New York Times* is seen.

In summary, plaintiff fails to establish that the remote user defense is unavailable to defendant. The factors above indicate that the volume of provision of services associated with the trademarked product is minuscule in Florida. While the number of Commerce customers residing in Florida is increasing, there are no plans for business expansion into the Florida region. In addition, the 3,500 persons who are Commerce customers represents an extremely small fraction of the potential number of customers, in this case, 16 million. Furthermore, Commerce does not advertise directly to the Florida population. Accordingly, plaintiff fails to establish the market penetration prong under the *Tea Rose–Rectanus* doctrine.

### 2. *Good Faith*

Although the Third Circuit has not yet resolved the question of whether a junior user's prior knowledge of the senior user's trademark, standing alone, compels a finding of good faith, *A.J. Canfield*, 808 F.2d at 295 n. 4; *see also Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F.3d 311, 318 (3d Cir.1999) ("[W]e have not decided whether a junior user's knowledge of the senior user's use of a mark is sufficient to attribute bad faith adoption of the mark[.]"), *cert. denied*, 528 U.S. 1106, 120 S.Ct. 845, 145 L.Ed.2d 714 (2000), there is support for finding that a junior user's prior knowledge of a senior user's trademark is probative of, but not dispositive of, the question of whether the junior user acted in bad faith. *ACCU Personnel*, 846 F.Supp. at 1211 (citing *Rockland Mortgage Corp. v. Shareholders Funding, Inc.*, 835 F.Supp. 182, 195 (D.Del.1993)). Other courts, on the other hand, have found that a good faith user is one who has adopted a mark without knowledge of its use by a prior senior user, *see, e.g., Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 674–75 (7th Cir.1982), while other courts appear to find that a junior user's good faith use when use of the mark is done with deliberate intent to benefit from the senior user's reputation, *see Century 21 Real Estate Corp. v. Century 21 Real Estate, Inc.*, 929 F.2d 827, 829 (1st Cir.1991).

In this case, there is evidence that the junior user, here BankAtlantic, knew of the senior user's use prior to its use of the FLORIDA'S MOST CONVENIENT BANK mark. Here, evidence indicates

that defendant knew of plaintiff's use of the AMERICA'S MOST CONVENIENT BANK mark when defendant commenced use of its FLORIDA'S MOST CONVENIENT BANK mark. For example, CEO Levan testified that when BankAtlantic considered Commerce's marks and other materials, it did not conduct a trademark search and sought no legal opinion, *see* Levan Depo., Miller Decl. Ex. 3, at 31, 45, 46. Testimony of CEO Levan provides:

A: Commerce is America's Most Convenient Bank. And I thought it was a pretty good slogan, appealing to the desires of customers to have convenience. And I adopted the term FLORIDA'S MOST CONVENIENT BANK for BankAtlantic.

Levan Depo., Miller Decl. Ex. 3, at 19. Mr. Levan had concluded that neither a search nor legal opinion were needed because the marks were "not similar" and because the distance between Florida and the mid-Atlantic region eliminated the "opportunity for confusion." Levan Depo., Miller Depo. Ex. 3, at 82. Fuchs also testified, "Yes, we knew they were America's most convenient bank." Fuchs Depo., Miller Decl. Ex. 5, at 27.

In addition, prior to defendant's use of its mark, on December 6, 2001, BankAtlantic Senior Vice President Jarett Levan provided other executives with excerpts of Commerce's annual reports from 1996 to 2000. Fuchs Ex. 2, Miller Decl. Ex. 28. During this meeting, employees of defendant discussed Commerce's WOW! philosophy and referred to plaintiff's mark AMERICA'S MOST CONVENIENT BANK. Fuchs Depo. Ex. 2, Miller Decl. Ex. 28. Furthermore, in September 2001, BankAtlantic executive Andrea Weiner attended a conference wherein she took particular note of a presentation about Commerce's success. Weiner Ex. 1, Miller Decl. Ex. 29. Ms. Weiner later prepared a report to fellow executives describing features of banking services, naming Commerce as an example. Weiner Ex. 17, Miller Decl. Ex. 30. This evidence shows that defendant attempted to provide a substantial number of banking services similar to that of plaintiff. There is no evidence pointing to any bad faith intent on the part of defendant to reap the benefits of plaintiff's good will, or to carry out a purpose inimical to the interests of plaintiff. In other words, there is no evidence indicating an intent to profit off the alleged well-known name of plaintiff and gain economically off the public's recognition of plaintiff's mark. Rather, this evidence demonstrates that defendant wished to provide similar banking options to its customers, in hopes of achieving similar commercial success.

The deposition testimony of BankAtlantic CEO Alan Levan supports the conclusion that the slogan was used to describe the convenience of defendant's services, in light of its belief that no confusion was possible because of the vast geographic separation. *See* Levan Depo. at 18–19, 82, Miller Decl. Ex. 3. Despite the evidence indicating that defendant wanted to provide services similar in nature to those provided by plaintiff, and because the Third Circuit has not yet determined whether bad faith is established by prior knowledge, standing alone, there is a question of fact whether defendant satisfies the good faith prong of the *Tea Rose–Rectanus* doctrine.

### 3. Conclusion regarding Tea Rose–Rectanus

According to the above, while there is a question of fact whether defendant commenced its use of the FLORIDA'S MOST CONVENIENT BANK mark in good faith, plaintiff is not able to establish that it penetrated the market of defendant by

the time defendant commenced use of its mark. No reasonable juror could conclude that plaintiff had penetrated the Florida market by April 1, 2002.[12]

### C. "Zone of Natural Expansion"

 Even if the senior user has not established market penetration, "it may still possess superior rights in the mark in the remote territory via two additional theories[,]" that is, the reputation theory and the "zone of natural expansion" theory.[13] *Laurel Capital*, 45 F.Supp.2d at 482. Commerce contends that even if it has not yet established trademark rights in Florida, it may do so under the theory of "zone of natural expansion," citing to J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 26:20 at 26–32 (2002). This theory provides plaintiff no relief. As stated in *Laurel Capital*, the natural zone of expansion theory "affords the senior user 'breathing space' within which to expand, and it is generally recognized that 'if a senior user has constantly expanded its business by the date of the junior user's adoption of the mark, and if distances are not great, it may be that the senior user is entitled to exclusive rights in a zone of natural expansion which includes the junior user's area, even though no actual sales have yet been made in that area by the senior user.'" *Laurel Capital*,

45 F.Supp.2d at 493 (quoting *ACCU Personnel*, 846 F.Supp. at 1208). Considerations include: 1) the geographic distance from the senior user's actual location to the perimeter of the claimed zone; 2) the nature of the business and the size of the senior user's zones of market penetration and reputation; 3) the history of the senior user's expansion and assessment as to when the senior user could potentially reach the zone he claims; and 4) whether it would take a "great leap forward" for the senior user to enter the zone (*i.e.*, whether expansion into the claimed zone is the next logical step). *Laurel Capital*, 45 F.Supp.2d at 493 (citing *Tally–Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1028 (11th Cir.1989)). It is important to note, however, the Third Circuit has never explicitly adopted or rejected this theory. *Laurel Capital*, 45 F.Supp.2d at 493.

In *Laurel Capital*, a bank using a service mark "Laurel Savings Bank" brought a trademark infringement action against a rival institution that used the mark "Laurel Bank." The plaintiff bank had conducted business at six branch offices in Allegheny County and lower Butler County in Western Pennsylvania, while the defendant bank had seventy-two branches in twelve counties, approximately 100 miles away from plaintiff. The court held that

---

**12.** Defendant's argument citing the *Dawn Donut* rule, which stands for the proposition that irrespective of whether the junior user is on notice, there can be no likelihood of confusion until two products are marketed on the same territory, further supports this conclusion. *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir.1959). In *Dawn Donut*, the junior user adopted a mark in the Rochester area registered by plaintiff. However, the Second Circuit held that even though the defendant was on constructive notice when it began to use the mark, there was no possibility of confusion where plaintiff was not using the mark in the same area. Thus, the court

held that plaintiff was not entitled to an injunction.

**13.** The reputation theory is an arm of the market penetration theory, as there is no remoteness of geography if a senior user's reputation has penetrated the market before a junior user's use. *Laurel Capital*, 45 F.Supp.2d at 482 (citing 4 McCarthy on Trademarks § 26:16). That theory is not addressed in the parties' submissions.

These three theories of market penetration, reputation and natural zone of expansion are known as the "zones of protection." *Id.* (citation omitted).

defendant was not entitled to the natural expansion theory, stating that at the time of use, although defendant had begun a creeping westward expansion, it had not yet become an affiliate of the large financial institution of which it was a member, and determined that "it would certainly have been a leap [for Laurel National Bank] to extend into the greater Pittsburgh metropolitan area."

In this case, plaintiff asserts that its zone of natural expansion includes Florida because of its record of sustained and rapid growth, the relatively small distance between the Mid–Atlantic region and Florida, and the fact that Commerce and its subsidiaries do substantial business in Florida, as many people from the four-state region vacation in and move to Florida on a permanent or part-time basis. Although the distance in this case is considerably larger than in *Laurel*, plaintiff has substantial resources and means of advertising to customers in Florida, including increased internet advertising and account management.

It is true that Commerce has an extraordinary record of continuous and rapid growth, yet this growth is only relevant to the northeastern part of the country. While plans for plaintiff's business operations to expand north exist, there are no plans to expand operations southward. Commerce has not continually expanded into the southern region of the country. The evidence indicates, rather, that Commerce intended and currently intends to build upon its base in the northeast corner of the country only.

Although plaintiff raises *Pedi–Care, Inc. v. Pedi–A–Care Nursing, Inc.*, 656 F.Supp. 449 (D.N.J.1987), to support its position, that case is distinguishable as plaintiff in that case had already provided nursing services to people in the New Jersey and Pennsylvania region, and was therefore well-known and recognized in those areas. The court found that plaintiff's common law rights in its service mark extended into the marketing area served by defendant, even before defendant incorporated, stating that "not only was there a reasonable expectation that plaintiff would expand into defendant's marketing area [in New Jersey] plaintiff in fact expanded into the area." *Id.* at 456. Here, no such expansion into Florida has taken place, either before or after defendant came into being. *Pedi–Care* therefore fails to support plaintiff's position.

*Best Cellars, Inc. v. Grape Finds at Dupont, Inc.*, 90 F.Supp.2d 431 (S.D.N.Y. 2000) is also distinguishable. In that case, the court examined the "proximity of the products" inquiry in determining the likelihood of confusion as to trade dress. There, both plaintiff and defendant stores had envisioned a national rollout of stores, as Best Cellars, based in Manhattan, opened a store in Brookline and Seattle, and was very close to opening one in Washington, D.C., until it heard that defendant Grape Finds was opening its store there. The court found that there was considerable proximity between the products.

Unlike *Best Cellars*, there is no attempt made by either party to invade the territory of the other, nor has either party in this case indicated an intention to carry out a "national rollout plan." While there is evidence that plaintiff has Florida customers, and that defendant has customers located in the mid-Atlantic area, it does not demonstrate that plaintiff and defendant have each attempted to expand into the territory of the other. In fact, they have not. The numbers of customers of either company, while seemingly large, are a very small portion of the customer base as a whole. From the lack of advertising specific to the region of the opposing party, it

can be inferred that such overlap of customers is incidental, rather than targeted. That each is recognized on a regional, not a nationwide, basis, further supports this conclusion.

Plaintiff also raises *Dunkin' Donuts Inc. v. Mercantile Ventures*, No. EP–91–CA–154–B, 1992 WL 156566, at *9 (W.D.Tex. Jan. 8, 1992). That case is inapposite. The parties in that case had already entered into stipulations demonstrating a likelihood of confusion. Despite this, the court found that Mazatlan was not a sufficiently distinct and separate market such that public confusion was not possible, primarily because Mazatlan was a popular tourist destination and Dunkin's Donuts already had international locations, and so expansion into Mexico was not inconceivable. *Dunkin' Donuts* is readily distinguishable in that it involved an internationally recognized chain, unlike the regionally based company of plaintiff.

Plaintiff's contention that it is reasonable to conclude that Florida is in Commerce's zone of natural expansion is thus not supported by this case law or by the facts Commerce offers. Accordingly, plaintiff is not entitled to superior rights under this theory.

### III. *CONCLUSION*

Based on the above, plaintiff is unable to prove validity of its mark because no reasonable juror could conclude that the mark acquired secondary meaning at the time and place where defendant commenced use of its mark. In addition, even if validity were proved, no reasonable juror could conclude that a likelihood of confusion exists in this case where defendant's and plaintiff's use of their respective marks are targeted to different regions, and where the services provided entails a high degree of care by the customer. In addition, plaintiff cannot establish that it had pen-

etrated the Florida market by April 2002, or that at the time defendant adopted its mark, plaintiff had superior rights under the "zone of natural expansion" theory.

Accordingly, defendant's motion for summary judgment with respect to plaintiff's claims as to the AMERICA'S MOST CONVENIENT BANK mark in Counts I, II, III and IV will be granted. Plaintiff's Lanham Act and common law claims with respect to the WOW! mark in Counts I, II and III, and its unfair competition claim with respect to the WOW! mark in Count IV, will remain. The accompanying Order will be entered.

### *ORDER*

THIS MATTER having come before the Court upon defendant BankAtlantic's motion for summary judgment of plaintiff Commerce Bancorp's Claims regarding the slogan AMERICA'S MOST CONVENIENT BANK, and plaintiff's cross-motion to dismiss defendant's motion for summary judgment; and the Court having considered the parties' submissions; and the Court having heard oral argument on this matter on May 30, 2003; and for the reasons explained in the Opinion of today's date; and for good cause shown;

IT IS on this 25th day of September, 2003, hereby

ORDERED that plaintiff's cross motion to the extent it seeks dismissal of defendant's summary judgment motion [Docket Item 27–1] be, and hereby is, *DISMISSED as moot*;

FURTHER ORDERED that defendant BankAtlantic's motion for summary judgment [Docket Item 25–1] be, and hereby is, *GRANTED* as to plaintiff's claims for trademark infringement and unfair competition with respect to its AMERICA'S

MOST CONVENIENT BANK mark in Counts I, II, and III.